ARTHUR R. KINTNER, LAWRENCE J. TOPEL, AND SIDNEY F. HOWARD, PLAINTIFFS AND CROSS-APPELLANTS, *v.* ARTHUR HARR, DEFENDANT AND APPELLANT, *v.* H. E. RIGGS, DEFENDANT AND RESPONDENT.

No. 10900.

Submitted September 15, 1965. Decided December 8, 1965.

408 P.2d 487.

462

Smith, Boone & Karlberg, Missoula, Russell Smith (argued), Missoula, Skelton & Hendricks, Missoula, Robert Skelton (argued), Missoula, for appellant.

Jay M. Kurtz (argued), Missoula, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This appeal and cross-appeal arises from an action in the District Court of the Fourth Judicial District, Missoula County, Honorable Emmet Glore, Judge, presiding. Arthur Harr, one of the defendants, is seeking a review of a judgment on a verdict against him for rent due under a lease and of a judgment by way of indemnity ordering him to pay attorney's fees to the other defendant, H. E. Riggs. Arthur R. Kintner, Lawrence J. Topel, and Sidney F. Howard, the plaintiffs, are seeking review of that portion of the judgment dismissing their claim against the defendant, H. E. Riggs. The case arose from the following facts:

On July 1, 1955, E. K. Taylor re-executed a lease of premises which he owned known as Murphy's Corner, 501 and 503 North Higgins Avenue, Missoula, Montana, to the defendant, H. E. Riggs. The pertinent terms of this lease provided:

"To Have And To Hold the above rented premises unto the party of the second part for and during the full term of ten (10) years from and after the first day of July, 1955. As rent for said premises the party of the second part agrees to pay the party of the first part, the sum of Two Hundred and Fifty Dollars ($250.00) a month for a period of seven years (7) from the date above mentioned, and Two Hundred and Seventy Five Dollars per month for the last three years of this lease, payable on the first day of each and every month during the period of this lease. The party of the second part agrees that during the period of this lease he will occupy said premises so as not to violate any of the laws of the City of Missoula or the State of Montana or of the United States. If the party of the second part shall fail to pay said rental promptly when due or shall fail to fulfill the other terms of the lease to be performed by him, then and in that event, the party of the first part may at his option terminate and cancel this lease and take possession of and re-enter said premises without such re-entering working

a forfeiture of the rents to be paid or the covenants performed.

"The party of the second part agrees that he will not assign or sublet this lease or the above rented premises without first having obtained the written consent of the first party so to do. The party of the first part shall furnish water to said premises during the period of this lease except that if water is used for anything except the usual amount for bar, cafe, etc., the party of the second part shall furnish his own light and heat. At the termination of this lease the party of the second part shall quietly yield and surrender possession of said premises to the party of the first part in as good condition and repair as when he takes them, reasonable wear and tear and damage by the elements alone excepted."

Riggs took possession of the premises and thereafter at that location operated a cafe and bar licensed by the Montana Liquor Control Board.

In the Fall of 1962, Arthur Harr commenced construction of the Red Lion Supper club in Missoula. Having no liquor license for the establishment, he alerted a real estate agent, one Ollie Sokolski, to watch for one. It soon became known to Sokolski that Riggs might sell the one under which he was operating Murphy's Corner, and consequently Riggs and Harr were brought together in negotiations. On December 22, 1962, Riggs and Harr had Sokolski, who was not a lawyer, draft an instrument which they signed entitled "Receipt and Agreement to Sell and Purchase," which in pertinent part is set out in part as follows:

"RECEIVED FROM Arthur Harr (hereinafter referred to as purchaser) the sum of Five Hundred & No/100 Dollars ($500.00) as a deposit and earnest money in part payment of the purchase price of the following described real property situated in Missoula, County of Missoula, State of Montana, to-wit: Murphy Corner, 510 North Higgins Avenue Liquor License No. 5172 and owned by Henry E. Riggs.

"*It is agreed and understood only the State License is in-*

*volved in this sale. The purchaser hereby agrees to assume the remainder of present lease executed with E. K. Taylor, the owner."* (Emphasis supplied.) * * *

[The next provision explicitly stated that no fixtures of any kind or personal property of any kind was to be left upon the premises as a part of the property purchased.]

"It is hereby agreed that the total purchase price is the sum of Nine Thousand & No/Dollars ($9,000.00) payable as follows:" [Then follow the terms of payment: $500.00 in earnest money receipted as stated above; $3,500.00 to be paid on or before Jan. 1, 1963; a mortgage of $5,000 to be executed between the parties, due and payable Feb. 15, 1964, together with 6 percent interest, from Jan. 1, 1963.] * * *

"5. Possession shall be delivered Purchaser on or before Jan. 1, 1963.

"6. Purchaser enters into this Agreement in full reliance upon his independent investigation and judgment and there are no verbal or other agreements which modify or affect this Agreement. * * *

"8. Special provisions: It is further agreed and understood that the purchaser agrees to assume the obligation of the purchase of the 1963 City License, the January 1963 rental and the operation of Murphy's Corner if so desired."

We observe that the opening sentence, which we have underlined, would be clear as if it stood alone. However, to do so would ignore the balance of the agreement. It is at least ambiguous in these particulars and as will hereafter appear we look to the surrounding circumstances to determine the intent of the parties.

During the following week, on December 31, 1962, the plaintiffs, Arthur R. Kintner, Lawrence J. Topel, and Sidney F. Howard, purchased the premises on which Murphy's Corner was located from E. K. Taylor and as provided in their contract received an assignment of the rentals to become due:

"It is known to the parties hereto that all or portions of the

buildings upon said premises are presently leased to tenants. The buyers agree to assume and have full responsibility for said leases with the right to terminate the same or renegotiate leases and shall be entitled to all of the rents and other income thereof during the period of this contract."

Neither the plaintiffs nor E. K. Taylor consented in writing to any assignment of the Riggs lease, nor was any copy ever transferred to Harr at the time the "Receipt and Agreement to Sell and Purchase" was signed. Harr took possession of the premises, afterward subleasing them on a week to week basis throughout the months of January and February to one Oscar Ball. Harr collected the rents from Mr. Ball and then paid them to Sokolski who remitted them to the plaintiffs. There is no dispute that Harr paid the rents for the months of January, February and the first two weeks of March. According to the testimony, it was his intention to move the liquor license to the Red Lion as soon as its transfer was approved and then to attempt to secure a beer license for Murphy's Corner which he hoped to operate as a Haufbrau.

On January 9, 1963, the plaintiffs received from the Missoula city fire marshal and city building inspector, both of whom had made an inspection of the premises shortly before, a letter listing hazards in the building and in the equipment that violated the city code requirements and rendered the premises unsafe. The plaintiffs shortly thereafter employed an electrician to go upon the premises to correct any deficiencies in the building. No defects in the equipment were corrected.

Further inspections of the premises were made by the city officials during the months of January and February culminating in a letter by Kenneth J. Lampert, M.D., city health officer, on February 7, 1963, copies of which were sent to each of the plaintiffs and to Mr. Harr. This letter informed the parties that a thorough inspection of the premises had been made and listed certain gross violations of current sanitation requirements that needed correction before a new ownership license for the bar and cafe could be issued by the Montana State

Board of Health. Throughout the months of January and February, 1963, Harr and one or more of the plaintiffs met several times to discuss the situation on the premises, but no agreements nor action resulted from any of these meetings. Harr estimated that it would cost at least $10,000.00 to renovate the premises to put them in condition for serving food and drink to the public in conformance with the regulations of the city and state.

Consequently, on February 21, 1963, the day on which the liquor license transfer from Riggs to Harr was approved by the Montana Liquor Control Board, or on a day shortly before or after February 21, Harr went to the plaintiffs and to Sokoloski, and attempted to return the keys to the premises. The plaintiffs refused to accept any keys and continued to hold Mr. Harr primarily responsible for the rents due under the lease. The premises were closed down by Harr on or about February 22, 1963. Thereafter, Riggs removed his personal property. No further rents were paid.

The plaintiffs filed this suit on May 21, 1963, alleging failure and refusal of the defendants, Arthur Harr and H. E. Riggs, to pay the rents due under the lease. The case proceeded to trial, but before the matter was given to the jury, Riggs was granted a directed verdict and dismissed from the suit. Following a trial a judgment awarding him $500.00 for attorney's fees was entered. The jury returned a verdict against the defendant Harr and found rents due the plaintiffs to that time were $3,850.00. Judgment was entered on the verdict, and this appeal followed.

The plaintiffs in their specifications of error, as cross-appellants, conclude that "Everybody in this case did exactly what they were obligated to do except Harr. He should not be excused from his performance after receiving all he bargained for." But as to the directed verdict for Riggs they ask for a reversal. Their specifications are as follows:

The court erred in directing a verdict in favor of Riggs and

against the plaintiffs; in denying plaintiffs' motion for a summary judgment against the defendant Riggs; in refusing plaintiffs' motion for a directed verdict against the defendant Riggs; and in refusing to instruct the jury to return a verdict against Riggs.

In his specification of error defendant Harr, as appellant, lists:

Error in failing to dismiss the complaint for failure to state a claim against Harr; in admitting certain testimony as unresponsive and tending to vary a written instrument in violation of the parol evidence rule; in failing to dismiss at the close of the plaintiffs' case; in instructing the jury; in denying the motion to strike the prayer for attorney's fees from Riggs' cross-complaint; and in awarding judgment by way of indemnity of $500.00 to Riggs for attorney's fees.

These specifications of error may be reduced to these questions:

1. Whether there was a valid and enforceable assumption by Arthur Harr of the lease between H. E. Riggs and E. K. Taylor?

2. If there were such an assumption was H. E. Riggs relieved from his obligations under the lease to the plaintiffs as lessor's assignees?

3. Whether a person who assumes a lease becomes an indemnitor for all claims, demands and liabilities, including costs of defense and counsel fees in favor of the person from whom he took the lease? and

4. Whether the plaintiffs, lessor's assignees, had a duty to put the premises in a condition conforming with the sanitation requirements of the City of Missoula and the State of Montana, which failure so to do effected a constructive eviction of Arthur Harr from the premises?

Our answers will follow in the order just stated.

The validity and enforceability of Harr's promise to assume the E. K. Taylor lease centers in the legal effect of the "Receipt and Agreement to Sell and Purchase" executed between Harr

and Riggs. Harr argues that this document "does not transfer any interest in the liquor license from Riggs to Harr, nor does it transfer any interest in the lease to Murphy's Corner from Riggs to Harr." Therefore, he argues, it is merely a preliminary agreement evidencing the intention of the parties that Riggs "would" sell his license on Murphy's Corner to Harr and that Harr would pay the rent in accordance with the terms of the lease. The subsequent transfer of the license upon approval thereof by the Montana Liquor Control Board together with the payment made in conformity with the terms of the agreement constituted only partial execution of the transaction, the transfer of the lease yet to be fulfilled. "Riggs did, in fact, transfer the liquor license to Mr. Harr and Mr. Harr did, in fact, pay Mr. Riggs $9,000.00 for the license." But, "Riggs never did sublet or assign his interest in Murphy's Corner to Mr. Harr thereby giving Mr. Harr any right to operate Murphy's Corner or any consideration for the payment by Harr of the monthly rental." In order to complete this transaction Harr contends that he "was entitled to something for the payment of the rental due under the lease." Just what this something is, is not clearly stated. Harr admits taking possession of the premises and paying the rents for two and one-half months, and agrees that "Riggs, the lessee, intended to sub-let or assign the lease because the said agreement provided for Harr to operate Murphy's Corner if so desired." In fact, in his brief Harr states:

"Riggs' intention is shown by his testimony wherein he said, 'I had no intentions of operating one [a bar]. I sold it all, lease and all.'" Where Riggs failed to effectuate this intention is not explicitly nor clearly argued. Apparently, because he failed to execute some writing transferring the lease or failed to transfer the paper on which the lease was recorded, there was no "document in evidence that meets the requirements" of section 67-1601, R.C.M.1947, which sets forth the rule that:

"An estate in real property, other than an estate at will or for a term not exceeding one year, can be transferred only by

operation of law, or by an instrument in writing subscribed by the party disposing of the same, or by his agent thereunto authorized by writing."

Furthermore, Harr's argument continues, inasmuch as the price of the liquor license as recorded in the document was $9,000.00, there was no consideration recited for Harr's promise to assume the lease. No evidence, therefore, could be admitted to prove that Riggs considered both the $9,000.00 cash and the promise to assume the lease as constituting the total consideration for the transaction, because to admit such evidence, says Harr, would violate the parol evidence rule by varying the plain and explicit terms of the written agreement.

We are not convinced by Mr. Harr's logic and fail to see that his position is supported by the law. Under the rules of this jurisdiction governing the interpretation of contracts, "the intention of the parties is to be ascertained from the writing alone, if possible," (section 13-705, R.C.M.1947), and the "whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (section 13-707) "The words * * * are to be understood in their ordinary and popular sense" (section 13-710) with "particular clauses" being "subordinate to its general intent." (section 13-716).

In the recent opinion in Lowe & Lynn v. Flank Oil Co., 144 Mont. 499, 504, 398 P.2d 608, this court held that our position being one of interpretation we look to our cases for guidance. It is a fundamental rule that in the construction of contracts the courts may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made. See Merriam v. United States, 107 U.S. 437, 441, 2 S.Ct. 536, 540, 27 L.Ed. 531, 533. To ascertain the intention, regard must be had to the nature of the instrument itself, the condition of the parties executing it, and the objects which they had in view. The words employed, if capable of more than one meaning, are to

be given that meaning which it is apparent the parties intended them to have. I Beach on Modern Law of Contracts, 702. See Smith v. School District No. 18, 115 Mont. 102, 139 P.2d 518; 12 Am.Jur., §§ 236, 249.

Applying these rules to the Receipt and Agreement to Sell and Purchase which embodies the contract between Riggs and Harr, and with the knowledge that this instrument was drafted by a layman, let us examine the testimony at the trial concerning the circumstances surrounding the making of the contract. During the trial Harr testified:

"Q. And on December 22nd, then didn't you find yourself in a position where you could not get the Riggs' license, liquor license unless you agreed to pay the rents on the lease between Riggs and Taylor? A. Yes, I agreed to assume them. I've never denied not to pay them."

That this was an integrated transaction is explained by Mr. Sokoloski who drafted the instrument:

"Q. And how did you initially get into the transaction Mr. Sokoloski? A. Well, I knew Mr. Harr was looking for a liquor license; and in fact, I had been asked to keep my eye open for him.

"Q. By whom please? A. By Mr. Harr. And about that time, which was in December, Mr. Riggs, who I know real well, came and told me that he was—had to take back the Murphy's Corner business and liquor license; and he didn't want to go back to running it himself. And naturally being in the selling business, I asked if he would resell it.

"Q. And did you then get Mr. Riggs and Mr. Harr together? A. I got them together and I think, as I recall, they met together themselves a couple times too.

"Q. Now, during the course of the negotiations, did the matter of the lease that Riggs had with Mr. Taylor come up? A. You mean as far as I was concerned?

"Q. Yes. A. Yes.

"Q. Between them. A. That came up several times, and there was a very important matter to Mr. Riggs; because he

474

knew the—I think it was about two and a half years or over two years left on it. And, of course, he was aware of the fact that it had to be assumed if he sold the liquor license out or be purchased with the liquor license.

"Q. And in that connection then who drafted Plaintiffs' Exhibit Number One [Receipt and Agreement to Sell and Purchase]? A. I wrote that up myself on the typewriter.

"Q. And was that written up pursuant to the conversations that were had between Mr. Riggs and Mr. Harr? A. Yes. That is, everybody was aware of the sale price, the lease that was involved with Mr. Taylor as well as when the, the taking over of the license would take place. In fact, I have in this agreement—this was dated December 22nd at the bottom here under a special provisions. I further stated that Mr. Harr was to purchase the 1963 City license for Murphy's Corner.

"Q. Now, in connection with the lease and in connection with the price to be paid for the lease, did Mr. Harr do any calculating? A. Yes. We—in fact, both of us calculated and figured out the price that we were selling this liquor license, which was $9,000, and the balance of the lease that if he didn't operate Murphy's Corner at all he was still paying a market price for the liquor license.

"Q. And was that the subject of conversation between you and Harr? A. Quite a bit so, you bet.

"Q. And if he paid the whole of the rental on the lease and didn't operate that, still he was within the market price on the license? A. Yes. Go a step further. We had a number of suggestions, even of putting some other business in there after the liquor license went out. Even just a beer joint or beer operation or a Heidelhaus. We had a number of talks about it and really wasn't settled on exactly what might continue on other than the operation would have to continue for whatever length of the lease that was left. But we had a number of discussions on it. And, of course, the price of the liquor license that Mr. Riggs sold for was, well, establishes in my mind that the lease was very heavily considered."

█ This testimony reveals how the price of the license was reached and explains the consideration which was adopted by the parties. It is fundamental in the law of contracts that consideration, as essential evidence of the parties' intent to create a legal obligation, must be that which the parties adopt and regard as such. See Farmers' & Miners' State Bank v. Probst, 81 Mont. 248, 263 P. 693; Sears v. Barker, 126 Mont. 101, 244 P.2d 516; 17 Am.Jur.2d, Contracts, § 92, 17 C.J.S. Contracts § 74. Harr got what he bargained for, the liquor license and the rights and obligations by assuming the lease. Riggs, likewise got what he bargained for, $9,000.00 cash and the relinquishment of his rights and release of the obligations under the lease.

█ What then remained to be done? The license had, been transferred. The $9,000.00 payments were made in accordance with the agreement. Harr had taken possession of the premises under the lease, had operated the bar and paid the rent for two and one-half months. Now he says he is not obligated to do so under his contract with Riggs because there is "no document in evidence that meets the requirements of" section 67-1601. We fail to agree. The "Receipt and Agreement to Sell and Purchase" is such a document itself satisfying every requirement of that transfer statute. The lease (an estate in real property), has been transferred by the "Receipt and Agreement to Sell and Purchase" (an instrument in writing) which has been signed by Riggs (the person disposing of the same). Within this document there is explicit reference to the "present lease" between Riggs and Taylor thus incorporating by reference all the terms, obligations, conditions and rights as embodied in that document. Harr must have known his rights and obligations under the lease which he assumed because appearing as paragraph 6 in the "Receipt and Agreement to Sell and Purchase," which document bears his signature, is this affirmation:

"Purchaser enters into this Agreement in full reliance upon his independent investigation and judgment and there are no

verbal or other agreements which modify or affect this Agreement." We agree that "Harr was entitled to something for the payment of the rental due under the lease." He got it: a valuable liquor license, the income which might arise from operating the leased premises, and all other rights arising under the lease.

Professor Wigmore, in his work on Evidence (3rd ed.) section 2466, submits a story taken from the works of Dr. Wm Paley, Principles of Moral and Political Philosophy, b. III, p. I, c. V., "Promises," which well illustrates the situation which Mr. Harr has created for Mr. Riggs. See Brown v. Homestake Exploration Corp., 98 Mont. 305, 331, 39 P.2d 168, 176:

"Temures promised the garrison of Sebastia, that if they would surrender, *no blood should be shed.* The garrison surrendered; and Temures buried them all alive. Now Temures fulfilled the promise in one sense, and in the sense too in which he intended it at the time; but not in the sense in which the garrison of Sebastia actually received it, nor in the sense in which Temures himself knew that the garrison received it; which last sense, according to our rule, was the sense in which he was in conscience bound to have performed it."

Since Harr took his rights under the lease as well as assumed the obligations, his contention that there was no privity of estate or mutuality of remedy between him and the assignees of the lessor is without merit. The legal effect of the "Receipt and Agreement to Sell and Purchase" makes him an assignee of the lessee and give him every right under the lease that Riggs had. Section 67-706, R.C.M. 1947. This is not altered by the fact that a covenant in the lease prohibited assignment without written approval of the lessor. That provision is for the benefit of the lessor and may be waived by accepting rent from the assignee and permitting him to remain in possession. Crossman v. Fontainebleau Hotel Corp., (U.S. C.A. 5th Cir. 1959), 273 F.2d 720, 728; People v. Klopstock, 24 Cal.2d 897, 151 P.2d 641; Trubowitch v. Riverbank Canning

Co., 30 Cal.2d 335, 182 P.2d 182; Nelson v. Seidel, (Tex.Civ. App., 1959) 328 S.W.2d 805.

"A restriction against assignment or subletting may be waived expressly or by implication flowing from the act, acts, or conduct of the lessor in recognition of the validity of an assignment or subletting, with knowledge thereof, as where, with knowledge of the facts, he permits an assignee or subtenant to remain in possession, and accepts subsequently accruing rents from him, but the acceptance of rent must be with knowledge of the breach." 51 C.J.S. Landlord and Tenant § 34, p. 547. Consequently, Harr cannot use such an express provision in an attempt to say there has been no valid assignment made.

We turn now to the question whether Riggs was relieved from his obligations under the lease after it was assumed by Harr. A lessee's obligations under an assignment is stated by the rule expressed in 32 Am.Jur., Landlord and Tenant, § 356, pp. 310-311:

"The obligations and liabilities of the lessee to the lessor, arising from express covenants in the lease are not affected by the lessee's assignment of the lease to a third person, in the absence of an express or implied agreement on the part of the lessor to that effect, or in the absence of an action on his part which amounts to a waiver of his right to insist upon compliance with the covenants, or which estops him from relying thereupon, and this is true even though the assignment is with the consent of the lessor. In other words, the lessor, notwithstanding an assignment of the lease by the lessee, and in the absence of further contract between themselves, retains his right to enforce against the lessee all the personal covenants contained in the lease, wholly unmodified and unaffected by the fact of the assignment."

Thus, by an assignment of a lease the privity of estate between the lessor and lessee is terminated, but the privity of contract between them still remains and is unaffected. Ernst

478

v. Conditt, (Tenn.App., 1965), 390 S.W.2d 703; Viera v. Soto, D.C., 240 F.Supp. 541.

Ordinarily an assignment of a lease does not release the lessee from his obligations even though the lessor consents to the assignment. Nor does the express assumption by the assignee of obligations under the lease affect the liability of the lessee to the lessor. Peiser v. Mettler, 50 Cal.2d 549, 328 P.2d 953, 74 A.L.R.2d 1; Flynn v. Mikelian, 208 Cal.App.2d 305, 25 Cal.Rptr. 138; Gerber v. Pecht, 15 N.J. 29, 104 A.2d 41. The rule is well-established that real covenants create in the covenantor a contractual duty which cannot be escaped simply by transferring the property to another. The question of continued liability of the covenantor after assignment turns upon the express or presumed intention of the parties to the contract. In the absence of an express provision, their intention should be determined from the language of the entire contract, giving due consideration to the surrounding circumstances. Pratt-Low Preserving Co. v. Evans, 55 Cal.App. 724, 204 P. 241; Proctor v. Union Coal Co., 243 Mass. 428, 137 N.E. 659; City of Glendale v. Barclay, 94 Ariz. 358, 385 P.2d 230; 2 Casner, American Law of Property, § 9.18; 4 Corbin Contracts, § 864; 21 C.J.S. Covenants § 86, p. 943.

"In the absence of a surrender of the old lease and an acceptance of the assignee as tenant in place of the original lessee, the express covenant of a lessee to pay rent is not terminated by his assignment of the lease, even though the lessor has assented to the assignment and collected rent from the assignee. An implied covenant to pay rent based only on privity of estate, however, is destroyed by an assignment of the lessee's estate." 52 C.J.S. Landlord and Tenant § 528, p. 326.

Consequently, a mere assignment or assumption of a lease does not relieve the assignor of his liability created by his express covenant to pay rent. This is the result we reached in Irwin v. Marvel Petroleum Corp., 139 Mont. 413, 365 P.2d 221, a case dealing with the assignment of an oil lease. The assignor's liability, this court held, was not predicated on any volun-

tary acceptance of benefits arising from the transaction, but rather on the express agreement between him and his lessor.

It has sometimes been said that the effect of an assignment is to make the lessee a surety for the assignee. This follows from the general rule, heeded in this jurisdiction, that an assignee who assumes the obligations of the contract becomes primarily liable for their discharge, but the assignor remains secondarily liable, and the payee, or his successor, may sue either the assignor or assignee alone, or the two jointly. Herigstad v. Hardrock Oil Co., 101 Mont. 22, 52 P.2d 171. See also Kinyon Investment Co. v. Belmont State Bank, 69 Mont. 282, 221 P. 286; Murray v. Creese, 80 Mont. 453, 260 P. 1051; United States Building & Loan Ass'n v. Burns, 90 Mont. 402, 4 P.2d 703; Brown v. Homestake Exploration Co., 98 Mont. 305, 39 P.2d 168. Thus, in effect, as between the lessor and the lessee, who has assigned his rights under the lease and relieved himself of the obligations by having the assignee assume them, the lessee, nevertheless, remains an obligor to his lessor to whom the lessor may look for the payment of rent. The burden of the obligation can be transferred only with the consent of the party entitled to its benefit. R.C.M.1947, § 58-301.

In the case at bar, we have no evidence that the assumption by Harr of the Riggs' lease was done with the consent of the lessor, E. K. Taylor or Taylor's assignees, the plaintiffs, that Riggs be relieved of his obligations under the lease. The fact that the landlord accepted rent from the assignee, as we have shown, does not amount to conduct, nor is it sufficient evidence of intention, releasing the lessee-assignor. See also James v. Johnson, 180 Okl. 106, 69 P.2d 51. It necessarily follows that Riggs remained liable for the rents under his contract with the lessor, the benefits of which were transferred to plaintiffs. Consequently, the district court erred in granting Riggs' motion to direct a verdict in his favor against the plaintiffs. As a matter of law, the plaintiffs' motion for a directed verdict against Riggs should have been granted.

Having decided that Riggs cannot escape his liability to the plaintiffs by asserting that the assumption of the lease by Harr is a defense, we turn now to the question raised by the judgment by way of indemnity awarding counsel fees to Riggs by the court. Riggs has taken the position, accepted by the court below, that the assumption agreement between him and Harr not only transferred the rights and obligations under the lease but also implied a further obligation by Harr to make good any losses, damages, costs and expenses, including reasonable attorney's fees, which Riggs might incur should Harr fail to comply with his assumed obligations.

Our rules on proper allowances for costs and disbursements in law suits are found in sections 93-8601 to 93-8631, R.C.M.1947. Specifically, section 93-8618, R.C.M.1947, outlines what are the costs and disbursements to which a party awarded costs is entitled. Counsel fees are conspicuously absent from that rather thorough list, and unless they may be included under the phrase, "and such other reasonable and necessary expenses as are taxable according to the course and practice of the court, or by express provision of law," they may not be awarded. Mr. Chief Justice Brantly, in the 1916 decision of Bovee v. Helland, 52 Mont. 151, 156 P. 416, set down the interpretation of this section which we have since consistently followed. In substance the rule is that attorney's fees may be recovered only when granted by special statute, by stipulation of the parties, or assuming that the district court may adopt a rule, when justified by a district court rule. But, it is well-settled law in this state that attorneys' fees are not allowed as costs under statutory provisions for costs in ordinary litigation, that they are not, in any proper sense, a part of the costs in a case. Adair v. Schnack, 117 Mont. 377, 387, 161 P.2d 641. See also, McBride v. School District No. 2, 88 Mont. 110, 290 P. 252; Smith v. Fergus County, 98 Mont. 377, 39 P.2d 193; In re Mickich's Estate, 114 Mont. 258, 136 P.2d 223; Gamble-Skogmo, Inc. v. McNair Realty Co., D.C., 13 F.R.D. 502.

Furthermore, it is not open to argument that in normal contract actions, attorney's fees are not to be included in the damages awarded. See Smith v. Fergus County, 98 Mont. 377, 39 P.2d 193. Consequently, we reverse the judgment by way of indemnity awarding counsel fees to Mr. Riggs; that he was forced to defend the plaintiff's action by the default of Harr is not questioned. But these counsel fees were incurred in his resistance to a claim for which he himself was liable. Only the costs recoverable in a contract action must be borne by Harr. Counsel fees under our law are no part of those costs. Neither has it been shown by the evidence that the parties intended them so to be, nor that a rule of the court did make or could have made them so.

We now direct ourselves to the final question raised by this appeal, whether the defendants were constructively evicted from the premises by the failure of the plaintiffs to correct the defects as found by the officials of the City of Missoula. It is claimed by Mr. Harr that he was constructively evicted because the plaintiffs would not agree to do the work necessary to comply with a directive of the State Board of Health. Mr. Riggs points out, and rightly so, that if Harr, as his assignee, was constructively evicted, thereby terminating the obligations due under the lease, he also was relieved.

To answer this question, we must ask and answer another: Who under the law had the duty to keep these premises in the condition required by the standards of the city and the state? Under section 42-201, R.C.M.1947, the law imposes a duty upon the lessor of a building intended for the occupation of human beings, in absence of agreement to the contrary, to "put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof which render it untenantable," except that the lessee, under the provisions of section 42-105, R.C.M.1947, must "repair all deteriorations or injuries thereto occasioned by his ordinary negligence." We have held that the proper scope of section 42-201 applies only to property used for habitation purposes and is not applicable

to business property. We said in Landt v. Schneider, 31 Mont. 15, 17, 18, 77 P. 307, 308:

"It is an elementary principle of law that, in the absence of a statute or agreement, there is no implied warranty that leased premises are suitable for the purposes for which they are demised, or that the lessor will keep the property in repair. [Citing cases.]." Consequently, section 42-201 is not helpful in deciding upon whom the duty in this case lay inasmuch as Murphy's Corner is business property.

However, we find in the lease itself an express agreement between the lessor and lessee upon whom the duty was to rest. The lessee, Riggs, explicitly agreed to "occupy the premises so as not to violate *any* laws of the City of Missoula or State of Montana." (Emphasis added.) That phrase is clear in its meaning and express in its purpose. Plainly, the lessee bound himself to operate the premises in strict compliance with all the ordinances and the laws of the city and the state, including the duty to keep the premises in the condition required by the sanitation standards. Mr. Harr, in assuming the "present lease" likewise assumed that obligation. He affirms that he entered "into this Agreement in full reliance upon his independent investigation and judgment." Consequently, he cannot now be heard to say that the duty to maintain the premises in a fit condition rested by law upon the plaintiffs as assignees of the lessor.

Furthermore, we note from the record that the deterioration in the condition of these premises was created by the negligent operation of the lessees. After Riggs went into possession, he remodeled, put in and took out partitions, moved the restaurant to the front of the building, cut holes in the floor, cut out one layer of flooring and attached his personal property to the floor, which when it was removed left holes therein. Also, the rotted wood in the floor was caused from leakage from water pipes that he had installed. Under no circumstances does the lessor have a duty to repair where the damage is caused from years of poor housekeeping and remod-

eling by the lessee. By section 42-105, the duty to repair in such a case is upon the lessee. Consequently, there was no error in the court's Instruction 7:

"You are instructed that it is never the duty of a landlord to make repairs made necessary by the remodeling of the premises by the tenant or by the carelessness of the tenant or those occupying the building under the tenant." That instruction states the law and properly informs the jury on the question of duty.

Mr. Harr also objected to the court's refusal to instruct the jury on the meaning of the word "owner" in the Missoula City ordinance § 5-2. That objection is not well-taken inasmuch as the ordinance has no bearing on the question of duty between a lessor and lessee where they have expressly by their contract agreed that the lessee has the duty to occupy the premises so as not to violate "any" ordinance of the City of Missoula and inasmuch as section 42-105 imposes upon the lessee the duty to repair for his careless and negligent occupation.

Since the plaintiffs were not by law required to maintain the premises in compliance with the sanitation regulations, there could have been no constructive eviction of Mr. Harr. The implied finding in the verdict of the jury on this point is sustained by the law and by the evidence.

Having ruled on the specifications of error as noted above, we now remand this case to the district court with instructions to dispose of the matter in the manner directed by this opinion.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE and CASTLES concur.