No. 80-249

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

MARJORIE B. KEISER,

Petitioner and Appellant,

vs.

STATE BOARD OF REGENTS OF
HIGHER EDUCATION and WILLIAM TIETZ,

Respondents.

---

Appeal from:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin.
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

Gregory O. Morgan argued, Bozeman, Montana

For Respondents:

Roger N. Flair argued, Bozeman, Montana

---

Submitted:  February 20, 1981

Decided:  May 1, 1981

Filed: MAY - 1 1981

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Marjorie B. Keiser, petitioner, sued the respondents in District Court, Eighteenth Judicial District, Gallatin County, for mandamus and declaratory judgment. She contended that the "continuous tenure" term of her last contract as Director of the School of Home Economics at Montana State University entitled her to receive the salary and the terms of that last contract, though she was no longer employed as the Director. After a nonjury trial, her petition for mandamus and declaratory judgment was denied. She has timely appealed.

The issue for us to decide is what the term "continuous tenure" meant in the contracts between these parties.

Under a contract dated January 15, 1968, Marjorie started her employment with the Montana State University, as a "Professor and Director" of the School of Home Economics. Her appointment was for the remainder of the academic year (January 15, 1968 to June 30, 1968). Her tenure status described on the contract was "annual" and her salary was fixed at $18,000 for the academic year.

On April 8, 1968, she signed a contract of employment for the 1968-1969 academic year (September 1, 1968 to June 30, 1969) as "Director, School of Home Economics". She was assigned the rank of "Professor" and her tenure status was described as "annual" with a salary of $18,000.

On April 14, 1969, Marjorie again signed the contract of employment for the 1969-70 academic year (September 1, 1969 to June 30, 1970) as "Director, School of Home Economics" at Montana State University. Her rank was that of "Professor" and her tenure status was "annual", with a salary of $18,600.

During the 1969-70 academic year, while Marjorie was on academic year appointment, she was recommended for "continuous tenure" with a rank of a full "Professor."

On April 14, 1970, she signed a contract of employment for the 1970-71 academic year (September 1, 1970 to June 30, 1971) as "Director" of the School of Home Economics at Montana State University; again she held the rank of "Professor", and her tenure status was described as "permanent" with a salary of $19,700.

On July 13, 1971, she signed a further contract of employment for the 1971-72 academic year (September 1, 1971 to June 30, 1972) as "Director, School of Home Economics" at Montana State University. Her contract stated she held the rank of Professor, that her tenure status was "permanent" and that her salary was $19,800.

On April 11, 1972, petitioner entered into a contract for employment for the 1972-73 academic year (September 1, 1972 to June 30, 1973) as "Director" of the School of Home Economics at the university; her contract gave her the rank of full "Professor", her tenure status was "permanent" and her salary was $20,450.

On April 24, 1973, she entered into a contract for employment for the 1973-74 academic year (September 1, 1973 to June 30, 1974) as "School Director" of the School of Home Economics at the university; her contract stated that she possessed the rank of "Professor", that her tenure status was "permanent" and her salary was $21,465.

On May 20, 1974, Marjorie again contracted for employment during the 1974-75 academic year (September 1, 1974 to June 30, 1975) as "School Director" of the School of Home Economics at Montana State University. Again, the contract stated that she held the rank of "Professor" and her tenure status was "permanent" with a salary of $23,533.

Each year of her employment as Director of the School of Home Economics, petitioner had been making status reports to her supervising dean. The administrative load of the school, particularly as it related to her, was a continuing subject of those status reports. Particularly on December 16, 1974, she reported that the increasing demands of administrative responsibility and the heavy teaching loads imposed on others in her school had been a burden and it had been impossible to get the help of any of the others to carry out some administrative responsibility. She pointed out that the ten-month academic term (AY) did not give her the flexibility needed nor sufficient time for both research and her administrative duties. She suggested that she ought to be given a twelve-month contract (FY) and an assistant director to aid in the administrative duties. Probably as a result, petitioner was given a contract of employment for FY 1975-76 (extending from July 1, 1975 to June 30, 1976). She was again denominated the "School Director" of the School of Home Economics. Her contract stated she held the rank of "Professor" and that her tenure status was "continuous", with a salary of $27,500, of which $2,000 was noted to be "for directorship."

On June 7, 1976, she again contracted with Montana State University for employment for FY 1976-77 (July 1, 1976 to June 30, 1977) as "School Director" of the School of Home Economics. Again her contract gave her the rank of "Professor" and her tenure status was "continuous"; her salary was $28,850 of which $2,000 was "for directorship."

On July 11, 1977, petitioner entered into her last contract of employment as a director, for FY 1977-78 (July 1, 1977 to June 30, 1978) of the School of Home Economics. Her contract stated that she held the rank of "Professor",

-4-

that her tenure status was "continuous" and that her salary was $30,000. It was noted that she was "on assignment to USDA from 9/1/77 through 6/1/78 with full costs to be reimbursed by USDA." No allocation of salary for directorship appears in the July 11, 1977 contract.

In 1978, Dr. William J. Tietz, as president of Montana State University, reorganized the administrative hierarchy in such manner that the directorship of home economics was no longer open to petitioner. In consequence, on May 30, 1978, she was offered a contract of employment for AY 1978-79 (September 1, 1978 to June 30, 1979) as "Professor of Home Economics"; her offered contract said that she held the rank of "Professor of Home Economics", that her tenure status was "continuous" and her salary would be $25,000 for the academic year. On June 19, 1978, petitioner signed the contract "under protest", stating that the contract offered was a violation of her rights as a tenured faculty member with a salary of $30,000 for FY 1978-79.

Petitioner's subsequent contracts have been for the ensuing academic year and have likewise been signed under protest by her under her continuing contention that she was tenured as a faculty member for a salary of $30,000 since June 30, 1978.

It is suitable now to set out the contract upon which petitioner bases her claim of tenure:

"MONTANA UNIVERSITY SYSTEM

Helena, Montana

PROFESSIONAL EMPLOYMENT CONTRACT

Date   July 11, 1977

THE BOARD OF REGENTS OF HIGHER EDUCATION OF THE STATE OF MONTANA, on behalf of the named institution, hereby enters into a contract of

-5-

employment with the employee hereinafter
named, such contract to be by and between the
institution and the individual and subject to
the following stated terms and conditions, and
in the case of tenurable professionals, subject
also to the rules and regulations of the Board
of Regents of Higher Education governing tenure
and termination.

Institution              Montana State University

Name                     Marjorie B. Keiser

Title                    School Director

Academic Rank            Professor

Department               School of Home Economics

Tenure:  Probationary Appointment_____
         Continuous Tenure_____X_____
         Non-Tenurable_____

Term of Contract:  Academic Year_____
         From_____To_____
         Fiscal Year____X_____
         From  July 1, 1977_____
         To    June 30, 1978_____
         Other_____

Annual Salary  $30,000(FY)*_____
         Payable in____12____installments

Special Conditions  * - On assignment to____
  USDA from 9/1/77-6/1/78 with full cost____
   to be reimbursed by USDA._____


/s/ W G Walter____      /s/ Lawrence H. Pettit
President               Commissioner of Higher
                        Education

     This contract, when used for tenurable professionals,
is made subject to the rules and regulations of the
Board of Regents of Higher Education governing tenure
and termination of employment. A copy of these rules
is attached and made a part hereof. Your acceptance
of this contract constitutes an acknowledgment and
acceptance of all provisions of these rules.

Date  Aug. 12, 1977_____   /s/ Marjorie Keiser
                           Signature of Employee

        To be valid this acceptance of employment
        must be returned with the proper signature
        to the president of the above institution
        within twenty-one (21) days of the date of
        notice of professional employment. "

Attached to that contract as an integral part is the

following:

"Board of Regents of Higher Education Rules for Tenure and Termination

. . .

TERMINATION OF APPOINTMENTS: . . .

9. Terminations Not for Cause. . .

. . .

(b) Financial exigency or discontinuance of program or department. In a termination of appointment based upon bona fide financial exigency, or bona fide discontinuance of a program or department of instruction, the dismissal procedures established in Section 11(a) shall apply.

In every case of termination related to financial exigency or bona fide discontinuation of a program or department of instruction, a member of the professional staff will be given notice of termination as soon as practible, but in no case less notice than specified in Section 3 above. In the event that such notice is not given, the professional staff member shall be entitled to severance salary for the period of required notice, dating from the time written notice was given.

Before terminating an appointment because of financial exigency or discontinuance of a program or department of instruction, the institution will make every effort to place the affected member of the professional staff in another academic position for which he is qualified in the institution. If an appointment is terminated before the end of the period of appointment because of financial exigency, or bona fide discontinuance of a program or department of instruction, the released professional staff member's position will not be filled by a replacement within a period of two years, unless the released member has been offered reappointment and a reasonable time within which to either accept or decline."

The District Court found, among other things, that department heads, directors, deans and vice presidents at Montana State University, as well as the president, have an opportunity to acquire tenure status to academic positions to which they have "retreat rights." Essentially, these rights give to the possessor thereof the right to be offered employment on the academic (instructional-research) staff upon resignation or removal (except for cause) from their

-7-

respective administrative positions. The court further
found that neither the Board of Regents nor the University
provided or intended that administrators exercising "retreat
rights" would have the right to demand that they continually
receive their administrative salaries or be employed for the
FY term of their administrative positions. The court also
found that throughout petitioner's employment, she understood
that her primary responsibilities were administrative and
not professorial, that the conversion of her contract from
AY to FY status with its corresponding increase in salary
was directly related to her employment as Director of the
School of Home Economics and not as a Professor, and that
the conversion of her employment contract to an FY status
was based upon her request because of her burdensome admini-
strative duties. The District Court therefore concluded
that her tenure rights did not give her a right to be employed
for the FY term nor for the salary for which she was employed
under her 1977-78 employment contract, as Director of the
School of Home Economics. On that basis, the court dismissed
the petition for mandamus and denied declaratory judgment,
and granted the respondents the right to recover their costs
in defending the action.

In addition to what we have set forth above respecting
the contract for 1977-78, that contract and each other
contract included the following paragraph 5 under "CONDITIONS
OF EMPLOYMENT":

> "5. Continuous Tenure Appointments. The
> appointment of a member of the professional
> staff beginning his or her eighth year or
> its equivalent of full-time service constitutes
> an award of continuous tenure status. . . The
> appointment of a member of the professional staff
> beginning his or her fifth year or its equivalent
> of full-time service at the institution in the
> rank of associate professor or of professor
> constitutes an award of continuous tenure status.

"Once the professional staff member qualifies for and is granted tenure, his professional faculty contract of employment, and his tenure, shall be with the appropriate institution within the Montana University System and not with the Montana University System."

The contract further provides in paragraph 8, "Terminations", that a termination of faculty member with continuous tenure may be "effected" by the institution "either for adequate cause, or not for cause as defined below".  Terminations "not for cause" include retirement by virtue of age or termination by virtue of financial exigency or discontinuance of a program or department.

The term "continuous tenure" is not defined in the 1977-78 contract, nor in any of petitioner's employment contracts, although the meaning of that term is the kernel of this case. All of her employment contracts since 1970 have denoted her tenure status as "continuous" or "permanent". It was incumbent upon the District Court, and now upon us, to determine what the parties meant in the use of "continuous tenure" as applied to the petitioner.

When the terms of the agreement have been reduced to writing by the parties, it is to be considered as containing all the contractual terms.  Section 28-2-905(1), MCA.  If there is an extrinsic ambiguity in the terms, resort may be had to other evidence.  Section 28-2-905(2), MCA.  An ambiguity exists when the contract taken as a whole in its wording or phraseology is reasonably subject to two different interpretations.  S-W Co. v. Schwenk (1977), 173 Mont. 481, 568 P.2d 145, also printed in 176 Mont. 546.  In the construction of contracts, courts may look not only to the language employed but to the subject matter and the surrounding circumstances, and may avail themselves of the same light which the parties possess when the contract is made.  Kintner v. Harr (1965), 146 Mont. 461, 408 P.2d 487.

The District Court concluded that the 1977-78 employment contract did not give petitioner tenure as to salary or as to the FY term. Those conclusions were derived from evidence outside the contract, because nothing in the last 1977-78 employment contract reflects anything but that petitioner's tenure, with rank of professor, is for a salary of $30,000 and a FY term. Unlike its predecessor FY contracts, no allocation of salary appears in the 1977-78 contract for her administrative duties. To determine whether the District Court was entitled to those conclusions, we must ourselves look to the subject matter, that is the meaning of continuous tenure, and the surrounding circumstances, in the "same light which the parties possessed when the contract was made." Kintner v. Harr, supra.

There is no constitutional or statutory right to tenure for professionals in the university system in Montana. Tenure rights, if they exist, must be found in the contracts of employment between the university system and the professional. The evidence here is, agreed to by both parties, that at Montana State University, each professional contract is individually negotiated. Since the contracts are individually negotiated, resort to other contracts of other professionals for evidence of their terms gives us little guidance as to what Montana State University and the petitioner meant when they negotiated and executed the 1977-78 employment contract.

Tenure, in its ordinary meaning, is the fact, manner, or means of holding possession or control of that which is one's own. People v. McCahey (1938), 296 Ill.App. 310, / 15 N.E.2d 988, 993. A common characteristic of all employment tenure agreements is that the institution makes a general commitment for employment which is generally expected to continue, with the

-10-

employee's consent, until his death or retirement. Hennessey v. National Collegiate Athletic Ass'n. (5th Cir. 1977), 564 F.2d 1136, 1142. Tenure is the status which protects a professional from dismissal, except for incompetence or serious misconduct. Collins v. Parsons College (Iowa 1973), 203 N.W.2d 594. Academia and both parties here seem to agree that:

> "Tenure is a means to certain ends; specifically: (a) Freedom of teaching and research and of extramural activities, and (b) A sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society." American Association of University Professors and the American Association of Colleges, Statement of Principles on Academic Freedom and Tenure (1940).

If then academic freedom and economic security are the goals of tenure, we determine that the parties had these goals in mind when the 1977-78 employment contract was executed. The three essential ingredients of that employment contract which were subject to tenure are: (1) The professional rank, (2) the salary, and, (3) the number of months contracted (the FY term).

Here the respondents contend that only the professional rank of professor was tenured, and that even as to that, petitioner was guaranteed only due process in holding that rank in subsequent years. Although the 1977-78 employment contract contains nothing with respect to an allocation of salary for her administrative duties, the respondents here unliaterally assigned a reduction of her salary to represent that component when they offered petitioner the 1978-79 AY contract. If "continuous tenure" allows that, then tenure means little or nothing and the goal of economic security, as important as the goal of academic freedom, no longer exists.

-11-

We are aided in our determination in this case that tenure included both salary and the FY term by the fact that respondents drew the contracts and had it completely within their power to describe the tenure rights otherwise. We see no harm to the university system from such a construction of this contract. Since each professional contract is individually negotiated, nothing prevents the institutions now or in the future from negotiating the ingredients of tenure as to form and extent. In the negotiating process, the professional rank will draw the least argument. That would ordinarily be the first step taken. With regard to salary and AY or FY terms, the institutions can set forth particularly what is tenured and what is not. In the petitioner's case, the terms of the 1977-78 employment contract are better construed in favor of the professional, since it was within the power of the institution to specify on the contract any deviation from continuous tenure of her full salary or the full fiscal year term.

We see no hardship in requiring the institution to hire the petitioner for the full FY term. She was employed by the institution during the summer of the 1978-79 year, for which she was paid $5,431 by the institution.

Having so determined the ingredients of petitioner's tenured status, we must reverse the District Court decision here. We remand the cause to the District Court with directions to grant the writ of mandamus for which she prayed, and to fix and determine the damages, if any, to which she is entitled. In that connection, her tenured status would entitle her to such increments as would ordinarily accrue following the 1977-78 year to professors of her rank and status in the institution. She is further entitled to her costs in prosecuting this action.

-12-

_____ John C. Steeby _____
                        Justice

We Concur:

_____ Gene B. Daly _____

_____

_____ Daniel J. Shea _____

_____ Frank B. Morrison Jr. _____
                        Justices

Mr. Justice John Conway Harrison dissenting:

I would affirm the complete and thorough findings of fact and conclusions of law and judgment of the District Court in this matter. We are not considering a question of tenure. Both parties admit that the tenure question is part of Dr. Keiser's contract with the University. The question is whether appellant is entitled to the salary of an administrative position which she no longer holds.

When the language of appellant's 1977-1978 employment contract is examined, there is no question that the University had a right to refuse to reemploy Dr. Keiser in a director's job, to refuse to give her a director's salary, or to hire her for a director's term. The rules and regulations of the Montana Board of Regents of Higher Education have been carefully examined, and I find no substantial evidence upon which the majority can rest its opinion. My review has not revealed any authority on which Dr. Keiser could rely to retain her present salary; nor can I find case law on any known statutory tenure within this State or otherwise which would support either the salary or the term of Dr. Keiser's contract.

A search of the treatises involved in this subject matter fails to reveal any authority indicating that a concept of nonstatutory tenure provides a guarantee of a particular salary or a term of contract. On the contrary, the persuasive authorities indicate a general consensus among the scholars and academicians that while there is no precise, universally-accepted definition of the nonstatutory tenure concept, the rights accorded by the latter are essentially procedural, i.e., tenure assures against a

refusal to reappoint the faculty unless and until certain "due process" procedures are adhered to. See Statement of Principles on Academic Freedom and Tenure, American Association of University Professors and the American Association of Colleges (1940); Legal Handbook for Educators, P. Hollander, 132 Westview Press (1978).

Dr. Keiser failed to prove that she placed any reliance on any generally promulgated or accepted concept of tenure which supports her position that her "tenure rights" give her the right of receiving the director's salary or to be employed for the director's term in view of the fact that she no longer was employed as the director of the school of home economics. Concerning the question of her salaried rights in an already recognized tenured position as a professor, there is ample authority that supports the findings of fact and conclusions of law and judgment of the District Court.

The case of Barnes v. Washington State Community College Dist. No. 20 (1975), 85 Wash.2d 90, 529 P.2d 1102, fully addresses the question of the interpretation and the application of nonstatutory tenure in the State of Washington. There the Supreme Court refused to extend tenured rights to departmental chairmen and, in so doing, held that such a refusal was "consistent with the accepted purposes of tenure." The question of the meaning and the purpose of tenure brought this response:

> ". . . The interpretation we have given them [the teacher tenure statutes] is the most reasonable to us in light of their language and apparent purpose. Most importantly, this interpretation is consistent with the accepted purpose of tenure, which is the primary concern of these statutes. The most authoritative source regarding the meaning

and the purpose of tenure is the American Association of University Professors. In 1940, the Association issued a Statement of Principles on Academic Freedom and Tenure which made clear that the purpose of tenure is to protect the faculty member in the classroom and in scholarly research. As quoted in C. Byse & L. Joughin, Tenure in American Higher Education: Plans, Practices, and the Law (1959) at pages 172 and 173:

"'Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole. The common good depends upon the free search for truth and its free exposition.

"'Academic freedom is essential to those purposes and applies to both teaching and research. Freedom in research is fundamental to the advancement of the truth. Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning. It carries with it duties correlative with rights.'

". . .

"These purposes would not be served by extending tenure to department heads in their positions as such, and administrative considerations militate against such an extension. In a statement adopted in 1966, the American Association of University Professors said:

"'The chairman or head of a department, who serves as the chief representative of his department within an institution, should be selected either by departmental election or by appointment following consultation with the members of the department and of related departments; appointments should normally be in conformity with department members' judgment. The chairman or department head should not have tenure in his office; his tenure as a faculty member is a matter of separate right. AAUP, Policy Documents and Reports 38 (1973).'" Barnes v. Washington State Community College Dist. No. 20, supra, 529 P.2d at 1104.

This rationale was adopted in a recent Florida Court of Appeals decision involving a departmental chairman of the University of Miami. Kirsner v. University of Miami

-16-

(Fla.App. 1978), 362 So.2d 449, cert. denied, 367 So.2d 1124. This case is substantially on all fours with the present case. In _Kirsner_ a tenured faculty member of the University of Miami brought a declaratory judgment action against the University, seeking a declaration that the latter was obligated to pay him the same salary he received as a department chairman, notwithstanding the fact that he no longer held that position. Ruling in favor of the University, the Florida Court of Appeals affirmed and cited with approval the Florida District Court's conclusion of law which held in part:

> "3. The fact that Plaintiff has tenure as a member of the University's faculty does not affect the University's right to reduce that portion of his salary paid to him for performing the duties of a Department Chairman since the tenure does not apply to administrative duties and positions."

The rationale of the Washington and Florida courts in denying faculty tenure to an administrative position or to its salary has been recently recognized by this Court in a case involving a "manager of services." Sibert v. Community College of Flathead County (1978), ___ Mont. ___, 587 P.2d 26, 35 St.Rep. 1780. Admittedly, that case dealt with the interpretation and application of statutory language (section 20-4-203, et seq. MCA) which covered teacher tenure; however, the reasoning articulated therein is instructive and applicable to the case at bar.

Faculty tenure at Montana State University is not an inherent employment right, nor is it one which has been created or defined by statute. It is a right which results, if at all, from an express grant (via regulation, contract or otherwise) of the governing body of the Montana

university system, which is the Board of Regents of Higher Education. That Board of Regents receives its powers from the Montana Constitution. Therefore, we must look to the actions and the enactments of this governing body of the university system to find if such a grant has been made, and, assuming it has, to the language and/or circumstances of the grant to determine the nature and extent of the rights that have been accorded.

The Board of Regents of Higher Education, under Art. X, Sec. 9, 1972 Mont. Const., is the governing body of the university system. As such, it is vested with "full power, responsibility, and authority to supervise, coordinate, manage and control the Montana university system. . ." Pursuant to this power and authority, the Board of Regents has provided for the granting of "tenure" to academic, i.e., instructional and research faculty at Montana State University under certain circumstances. The procedure by which "tenure" is granted, and the rights accorded thereunder, are set forth in the Board of Regents of Higher Education Rules for Tenure and Termination. These rules appear in toto on Dr. Keiser's 1977-1978 employment contract and, additionally, were printed in the faculty handbook for Montana State University and considered by the trial judge in his findings of fact and conclusions of law.

Paragraph 7, "Transfer of Titles," of the contract tenure rules provides:

> "Transfer of Titles. The offices and titles of deans, assistant deans, directors, heads of departments, and chairmen may be transferred by the president of the institution, in his discretion, from one member of the professional staff to another as the interests of the institution may require." (Emphasis added.)

-18-

There is no question that Dr. Keiser held the office of the Director of School of Home Economics at the "discretion" of the president of the Montana State University. She, like other administrators, did not and could not acquire tenure to the position, salary, contract term or any other privilege of that office.

By her contract, when Dr. Keiser ceased being employed as a director, with the director's salary and term, she once again became a tenured professor entitled to the salary accompanying that position.

For the above reasons I would affirm the opinion of the District Court.

_____
Justice