Vernon CLARK, Appellant,

v.

Albert N. WHITING, Individually and in his capacity as Chancellor, NCCU, Walter H. Pattillo, Individually and in his capacity as Chairman, Department of Biology, NCCU, William A. Clement, Individually and in his capacity as Chairman, Board of Trustees, NCCU, North Carolina Central University, the University of North Carolina, Mary M. Townes, Individually, Charles R. George, Individually, Shahbeg Sandhu, Individually, Wiley Armstrong, Individually, Appellees.

No. 77–2298.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1979.

Decided Sept. 17, 1979.

Thomas F. Loflin, III, Durham, N. C. (Carolyn McAllaster, Loflin & Loflin, Durham, N. C., on brief), for appellant.

Ben Irons, Asst. Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen., Edwin M. Speas, Jr., Special Deputy Atty. Gen., Elizabeth C. Bunting, Asst. Atty. Gen., Raleigh, N. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, RUSSELL, Circuit Judge, and JOHN T. COPENHAVER, Jr., United States District Judge for the Southern District of West Virginia, sitting by designation.

DONALD RUSSELL, Circuit Judge:

This is a § 1983, 42 U.S.C. action by an associate professor of biology at North Carolina Central University who complains of the denial of his several requests for academic promotion to a full professorship. To his alleged constitutional claim under § 1983, he has added a pendent state action in libel and slander.[1] The district court dismissed the constitutional claim on jurisdictional grounds. The dismissal of the non-constitutional pendent action followed as a matter of course. From this dismissal the plaintiff has appealed.

For purposes of reviewing the dismissal, the parties seem agreed on the essential facts as set forth in the complaint and exhibits submitted by the parties as parts of the record.[2] Unlike most federal cases in this area, the complaint makes no constitutional claim of racial or sex discrimination or of retaliation because of an exercise of First Amendment rights. Plaintiff's constitutional claim is simply that both his equal protection and due process rights were violated by the manner in which his requested promotion was handled.

The pertinent rules and regulations of the University, governing faculty promotions, provide that the central issue, in examining "qualification[s] for * * * promotion to the several instructional ranks," is whether the faculty member under consideration has demonstrated "continued growth," as evidenced by "specific instances." In determining whether there has been such

---

1. The defendants in this pendent action do not include the president of the University or the officers of the Board of Trustees, the primary defendants in the federal constitutional action, but only the head of the department of biology and three faculty members of that department.

2. The complaint did not include the rules and regulations of North Carolina Central University on promotions but the parties have included such rules and regulations in the appendix. We would, therefore, assume that the parties submitted these rules and regulations to the district court for consideration by it of the motion to dismiss.

"growth" three broad factors are looked to: "(1) teaching effectiveness, (2) scholarly achievement and contributions, (3) contributions to the academic community." With particular reference to promotion to the highest academic rank of a full professor, the rules and regulations go further and prescribe that the faculty member must have given "concrete evidence of continued growth by scholarly contributions of his field."

The rules and regulations set forth the procedures to be followed in determining whether to promote under these general standards. The process for considering a faculty member for promotion may be begun either by a recommendation of a committee from the faculty member's department or by his own direct request submitted to the Faculty Personnel Committee. In either event, the proposed promotion is first considered by the Faculty Personnel Committee. Any report of the Committee on the proposed promotion is submitted to the president of the University, who, if the report recommends promotion and he (the president) approves the recommendation, then refers the proposed promotion with his recommendation for final action to the Board of Trustees. If, however, the president disapproves the requested promotion, that normally ends the process.

In this case, the plaintiff himself initiated the request for his promotion to full professor with the Faculty Personnel Committee. His department head recommended to the Committee against promotion, finding, according to the allegations of the complaint, that the plaintiff had "failed to meet the publication requirements requisite to attaining the rank of Full Professor." According to the plaintiff's allegations, however, the Faculty Personnel Committee, despite the department head's disapproval, recommended at this time favorably on plaintiff's request and forwarded its recommendation to the president of the University.[3] The president disapproved the recommendation of the Committee and sustained the recommendation of plaintiff's department head. The plaintiff then requested a hearing before the Board of Trustees of the University. The rules and regulations of the University make no provision for a hearing in the event the president disapproves a request for promotion. Nonetheless, the request of the plaintiff for a hearing before the Board was allowed and the plaintiff was heard. The Board, also, heard from both the president and the plaintiff's department head their reasons for not recommending promotion. After the hearing, the Board of Trustees denied the plaintiff's requested promotion.

Sometime later the plaintiff renewed his request for promotion. This second request was disapproved by the plaintiff's department head, by the Faculty Personnel Committee and by the president of the University. Again, the plaintiff was heard at his request by the Board of Trustees which again sustained the denial of promotion. It was after this denial that this action was begun.

It seems agreed and it is so stated in plaintiff's complaint that the several denials of promotion of the plaintiff were based on the opinion of the University administration that the plaintiff had not given sufficient "concrete evidence of continued growth by scholarly contributions of his field" to warrant promotion to a full professorship. In fact, the plaintiff alleges expressly that "the only reason barring his promotion was his alleged lack of published scholarly work." At various points in his complaint, the plaintiff alleges that he submitted in support of his request for promotion and in evidence of his "scholarly contributions" a "self-published" laboratory manual prepared by the plaintiff for use in his classes,[4] his

---

3. In their answer, the defendants deny that the recommendation of the Faculty Committee was unanimous. Since, however, this matter arose on a motion to dismiss, the allegations of the complaint must be taken as true.

4. The plaintiff's pendent state claim is based on allegations that the head of the University biology department and three other members of that department, "or some of them, signed or caused to be signed," letters "accusing the

Ph.D. thesis and, finally, an article accepted for publication but not at the time published. These, he alleges, were found by the University authorities not "to meet the publication requirements requisite to attaining the rank of Full Professor."

The plaintiff bases his constitutional equal protection claim on the alleged failure of the defendants to apply the same standards in evaluating his qualifications for promotion and his "scholarly achievements" as were used "in the past" in passing on promotions of other faculty members. His due process claim relates to the hearing accorded him by the University Board of Trustees. It is his position, as stated in his complaint, that while he had an "entitlement" of right to a full-blown due process hearing, the voluntary granting of such a hearing by the Board in this case, irrespective of whether he had a legal right to such a hearing, required that the hearing granted by the Board conform to all the criteria of a complete due process hearing, including the right of confrontation and cross-examination of all witnesses heard by the Board.

■ The plaintiff's demand for relief, as set forth in his complaint, is that the district court "[i]ssue an injunction requiring the Defendants to grant the Plaintiff's promotion to the rank of Full Professor in the Department of Biology at North Carolina Central University and to cease violating the Plaintiff's rights to due process and equal protection of the law in their continued denials of his requests for promotion to Full Professor,"[5] along with compensatory damages and attorney's fees. As we have stated, the district court dismissed the action on jurisdictional grounds. The appeal accordingly presents for decision the propri-

ety of federal review under § 1983 on either due process or equal protection grounds of a denial of academic promotion premised on purely academic considerations. We agree with the district court that such review is inappropriate. We shall treat separately the two constitutional claims made by the plaintiff.

■ What the plaintiff assumes under his equal protection argument is that, by invoking that constitutional principle, or, as one court has aptly characterized it, by resorting to the " 'I'm just as good as you are' arguments,"[6] he can convert federal courts into "Super-Tenure [and Faculty Promotion] Review Committee[s],"[7] compelled to review every denial by a state-supported college, university or school of faculty promotion. What this argument disregards is that not every difference in promotion treatment—particularly a difference not in resolving questions of primary facts but in evaluating facts—rises to the level of a constitutional deprivation either under equal protection or due process. It is only when such unequal treatment, accorded under reasonable rules providing for the exercise of subjective discretion, violates a positive constitutional requirement that one subjected to such violation will have a remedy under § 1983.[8] And this principle has often been applied in federal courts. Federal courts thus have never been hesitant to intervene on constitutional grounds in the hiring, discharge or promotion of public employees, including academic personnel, where the asserted claim is that the action taken was tainted by racial or sex discrimination or was intended to penalize for the

Plaintiff of plagiarizing parts of the aforesaid laboratory manual from one or more other publications."

5. In his reply brief in this court, the plaintiff asserts that he has never claimed "that the University was obligated to promote him, that his contract guaranteed him this fringe benefit." Indeed, he agrees that if this were his claim, "the Appellees' arguments in their brief would have merit." It is difficult, however, to reconcile this statement with the plaintiff's prayer for relief as set forth in his complaint.

6. *Faro v. New York University* (2d Cir. 1974) 502 F.2d 1229, 1232.

7. *Keddie v. Pennsylvania State University* (M.D. Pa. 1976) 412 F.Supp. 1264, 1270.

8. *Prince v. Bridges* (4th Cir. 1976) 537 F.2d 1269, 1272; *Equal Employment Opportunity Com'n. v. Tufts Inst.* (D. Mass. 1975) 421 F.Supp. 152 at p. 158; *Peters v. Middlebury College* (D. Vt. 1976) 409 F.Supp. 857, 868.

exercise of First Amendment rights.[9] But, absent such impermissible sex or racial discriminations or First Amendment restraints—clear violations of positive express constitutional or statutory mandate—"[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood* (1976) 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684. This is especially so where the claim for relief rests on what we have referred to as the " 'I'm just as good as you are' " argument. *Faro v. New York University, supra,* 502 F.2d at 1232. Denial of a faculty promotion based on an evaluation of the faculty member's "scholarly achievements" is exactly the type of determination which, under *Wood,* is not justiciable in federal court in an action under § 1983. And that has long been the ruling uniformly applied by the courts,[10] and now affirmed in *Wood,* for which there is an abundance of supporting reasons.

■ A teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, determinations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests.[11] These determinations are

**9.** *United States v. Chesterfield County School Dist., S. C.* (4th Cir. 1973) 484 F.2d 70, 73; *North Carolina Teachers Assn. v. Asheboro City Bd. of Ed.* (4th Cir. 1968) 393 F.2d 736, 739, n. 1; *Johnson v. Branch* (4th Cir. 1966) 364 F.2d 177, 180–81, *cert. denied* 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967).

**10.** *Lewis v. Chicago State College* (N.D. Ill. 1969) 299 F.Supp. 1357, 1359 and 1360:
 "The judiciary is not the appropriate forum for decisions involving academic rank. A professor's value depends upon his creativity, his rapport with students and colleagues, his teaching ability, and numerous other intangible qualities which cannot be measured by objective standards."
*Beauchamp v. Davis,* 550 F.2d 959 at 961; *Stebbins v. Weaver* (7th Cir. 1976) 537 F.2d 939, 943, *cert. denied* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Chung v. Park* (3d Cir. 1975) 514 F.2d 382, 387, *cert. denied* 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282; *Scheelhaase v. Woodbury Central Community Sch. Dist.* (8th Cir. 1973) 488 F.2d 237, 244, *cert. denied* 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974); *Faro v. New York University, supra,* 502 F.2d at 1231–32; *Cook County College Teachers, Loc. 1600, A.F.T. v. Byrd* (7th Cir. 1972) 456 F.2d 882, 889, *cert. denied* 409 U.S. 848, 93 S.Ct. 56, 34 L.Ed.2d 90, *reh. denied* 414 U.S. 883, 94 S.Ct. 29, 38 L.Ed.2d 131 (1973); *United States v. University of Maryland* (D. Md. 1977) 438 F.Supp. 742, 746; *Cussler v. University of Maryland* (D. Md. 1977) 430 F.Supp. 602, 605–06; *Tyler v. College of William & Mary* (E.D.Va. 1977) 429 F.Supp. 29, 31–32; *Equal Employment Opportunity Com'n. v. Tufts Inst., supra,* 421 F.Supp. at 158; *Keddie v. Penn. State University, supra,* 412 F.Supp. at 1270; *Peters v. Middlebury College, supra,* 409 F.Supp. at 868; *Green v. Board of Regents of Texas Tech University* (N.D. Tex. 1971) 335 F.Supp. 249, 251, *aff'd.* (5th Cir.) 474 F.2d 594.
 In *Stebbins,* the Court said at p. 943:
 "Plaintiff also asserts that the defendants' arbitrary and capricious action in denying him tenure violated his constitutional right to substantive due process. This argument in effect asks us to review the merits of the decision to deny plaintiff tenure. We decline to do so."
 In *Chung,* the Court said at p. 387:
 "Moreover, the administration of the internal affairs of a college and especially the determination of professional competency is a matter peculiarly within the discretion of a college administration.
 "Due process should not be employed to insure that this exercise of discretion is 'wise' but only that it is not unreasonable, arbitrary or capricious. If the procedure used by the college is adequate to prevent unreasonable, arbitrary or capricious termination decisions, it satisfies due process."

**11.** *Lewis v. Chicago State College, supra,* 299 F.Supp. at 1359, ("are not mechanically measurable nor susceptible to visual comparison

in "an area in which school officials must remain free to exercise their judgment" especially since these determinations present unique questions for judgment by those with expertise in the specialized academic area,[12] capable of making professional evaluations of those elusive and intangible qualities and talents expected of the scholar and teacher. Courts are not qualified to review and substitute their judgment for these subjective, discretionary judgments of professional experts on faculty promotions or to engage independently in an intelligent informal comparison of the scholarly contributions or teaching talents of one faculty member denied promotion with those of another faculty member granted a promotion; in short, courts may not engage in "second-guessing" the University authorities in connection with faculty promotions. Yet that is exactly what the plaintiff seeks by his action to have the court do.

If perchance courts were, on equal protection grounds, to undertake to review faculty promotions by engaging in a comparison of competency and qualifications of those granted and those denied promotion in any academic field, they would, by parity of reasoning, be obligated to review the equality of treatment in connection with the grant or denial of faculty tenure. Nor is it a far step from such a review of faculty promotions and tenure to faculty salaries or assignments. In essence, what plaintiff thus argues for, if carried to its logical conclusion, is the judicial supervision of the most delicate part of every state educational institution's academic operations, a role federal courts have neither the competency nor the resources to undertake. The burden, which such an exercise of judicial process would involve, was vividly described by the Court in *Faro v. New York University, supra,* 502 F.2d at 1231–32, which concluded that "[o]f all fields, which

the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision." Its animadversions on undertaking such a task are illustrated by the circumstances of this case itself.

■■■■ If plaintiff's equal protection argument is applied to the facts of this particular case, the issue for the court would be whether the defendants, in reviewing the "concrete evidence" of plaintiff's "continued growth by scholarly contributions in his field," had given the same consideration, made the same analysis and reached a like judgment on his "scholarly" publications as it had on similar publications by other faculty members "in the past" in deciding on faculty promotions. The problem thus presented to the court would not be an easy one. The publications submitted by the plaintiff in support of his requested promotion were three. He asserts that, in other cases, similar publications such as these had been considered by the University authorities incident to the promotion determination. But what the plaintiff would overlook is that the question is not whether similar publications, or at least some of them, may have been considered in the promotion context in connection with other situations where a faculty promotion was approved; the question is how those publications may have been evaluated by the proper academic authorities as a basis for determining whether the faculty member had demonstrated "continued growth by scholarly contributions in his field." It is quality, not quantity, which is to be evaluated and it is that evaluation with respect to which courts are not qualified to "second-guess" the professional experts. We, therefore, refuse to embark upon a comparative inquiry under an equal protection claim into either the quantity or the

---

with conclusive result" (quoting *Application of Lombardo* (N.Y.App.Div. 1963) 18 A.D.2d 444, 240 N.Y.S.2d 119, 120–21)); *Equal Employment Opportunity Com'n. v. Tufts Inst., supra,* 421 F.Supp. at 158 (cannot be "reduced to measurements by mechanical processes or

standardized tests"); *Beauchamp v. Davis, supra,* 550 F.2d at 961, ("does not easily lend itself to precise quantification, nor, we might add, to judicial review").

**12.** *Beauchamp v. Davis, supra,* 550 F.2d at 961.

quality of the published scholarly contributions of the University's faculty members who have been granted or denied promotion, holding that the determination of such matters by the appropriate University authorities is not reviewable in federal court on any ground other than racial or sex discrimination or a First Amendment violation. This is exactly what we said in *Beauchamp v. Davis, supra,* 550 F.2d at 961, where we declined a similar invitation to enter the thicket of faculty evaluation and promotion.[13]

■■■■ Equally lacking in merit is plaintiff's due process claim based on his hearing before the Board of Trustees. The validity of this claim poses the threshold question of the circumstances under which one may acquire a right to a due process hearing. It is settled that to be entitled to a due process hearing, one must have suffered by the state action a loss of either a property or a liberty interest. *Arnett v. Kennedy* (1974) 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (Powell, J., concurring.) Ordinarily, academic promotions are within the discretion of the appropriate academic authorities. It follows that, absent some statute, ordinance or institutional regulation, a faculty member has no "property entitlement to a promotion and therefore lacks any constitutional basis for requiring some kind of hearing upon a nonpromotion decision" on that ground. *Colm v. Vance* (D.C. Cir. 1977) 196 U.S.App.D.C. 132, 137, 567 F.2d 1125, 1130;[14] *Schwartz v. Thompson* (2d Cir. 1974) 497 F.2d 430, 432; *Koscherak v. Schmeller* (S.D.N.Y.1973) 363 F.Supp. 932, 936 (three-judge court) *aff. mem.,* 415 U.S. 943, 94 S.Ct. 1462, 39 L.Ed.2d 560; *Olson v. Trustees of California State Universities* (C.D. Cal. 1972) 351 F.Supp. 430, 432.[15] Moreover, any contention that refusal to promote is sufficiently stigmatic to constitute a deprivation of liberty, giving rise to a hearing, has been consistently repudiated. *Bishop v. Wood, supra,* 426 U.S. at 350, 96 S.Ct. 2074; *Lake Mich. Col. Fed. of Teach. v. Lake Mich. Com. Col.* (6th Cir. 1975) 518 F.2d 1091, 1097–98, *cert. denied* 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197; *Dee Swain v. Board of Trustee* (N.D. Ohio 1979) 466 F.Supp. 120, 122.[16] The plaintiff takes no exception to these principles which would bar normally any due process claim by him.[17] He rests his claim on two

---

**13.** Of course, if the rule on its face discriminated against out-of-staters or non-graduates, a justiciable equal protection claim might be presented. When the rule is neutral on its face, however, a judgment in a particular case that there has or has not been compliance with it should be left to the responsible academic officials and not assumed by judges.

**14.** The plaintiff cited *Colm v. Vance* in support of his claim of a right to a due process hearing. That was in effect a *discharge* case, since, under the regulations, the failure to achieve a promotion would work a termination of employment. That presented an entirely different case from the normal nonpromotion case and the Court in *Colm* pointed out at length this distinguishing feature of the case.

**15.** *Board of Regents v. Roth* (1972) 408 U.S. 564 at 577, 92 S.Ct. 2701 at 2709, 33 L.Ed.2d 548 has specified the circumstances under which a party may have a "property entitlement" to a due process hearing:

"Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. * * *."

**16.** *See also, Arnett v. Kennedy, supra,* 416 U.S. at 156–158, 94 S.Ct. 1633.

**17.** The plaintiff did allege that the decisions to deny him promotion were "arbitrary" and "capricious." Such a bare claim, without any claim of impermissible constitutional violation, can only be construed as an assertion not of procedural but of substantive due process and, as Judge (now Justice) Stevens suggested in *Jeffries v. Turkey Run Consolidated School*

grounds unique to this case: first, he contends that the rules and regulations of the University gave him a right to a due process hearing; second, that the Board by granting him a hearing (albeit by courtesy and not by right) became obligated to give him a trial-type hearing, including the right of confrontation and cross-examination of all persons heard by the Board.

■ As we have already noted, the rules and regulations have been stipulated in the appendix in this appeal. The plaintiff has cited to us no requirement in such rules and regulations for a hearing on a denial of faculty promotion nor have we found one. Under those circumstances, the denial of a hearing to the plaintiff by the Board of Trustees would not have been a constitutional deprivation because of any provision of the University rules and regulations.[18] This leaves for consideration his second ground for a due process hearing.

The plaintiff was heard twice before the University Board of Trustees. Such hearings were not matters the plaintiff could claim of right since he had suffered neither a property nor a liberty deprivation by the denial of promotion. As we have said, however, the plaintiff argues that, when given a hearing by the Board, whether by right or by courtesy, he was entitled to the full panoply of rights attaching to a formal due process hearing involving either a livelihood or a liberty interest. For this reason, he contends he should have been accorded the right of confronting and cross-examining

the president and the plaintiff's department head before the Board of Trustees. We do not agree.

■ A governmental body may frequently extend to a disgruntled party a hearing, even though the party is not entitled of right to such a hearing. But, we do not subscribe to the view that such act of courtesy ripens automatically into an act of right generating all the requirements of a trial-type due process hearing, as the plaintiff would assert. We find the language of Judge (now Justice) Stevens in *Jeffries v. Turkey Run Consolidated School District,* supra, 492 F.2d at 3, persuasive on this point. He said:

> "But since, by hypothesis, no constitutionally protected property or liberty interest of the teacher [by denial or renewal of her contract of employment] is impaired by the Board's action, she has no federally protected right to a fair hearing or to a fair statement of reasons. The fact that a state, or a School Board, may voluntarily communicate more information to her, or receive more information from her, than the Constitution requires, is not in itself sufficient to create a federal right that does not otherwise exist." [19]

We adverted to this same point and said much the same in *Satterfield v. Edenton-Chowan Bd. of Ed.* (4th Cir. 1975) 530 F.2d 567, 571:

> "Whether the simple grant of the courtesy of a hearing under the circumstances of this case creates a right to a due

District (7th Cir. 1974) 492 F.2d 1 at 5, the "absence of either a property or liberty interest" is "fatal to a substantive as well as a procedural due process claim." The addition of these adjectives to his claim under the circumstances thus provides no weight to his argument for judicial review.

18. *See Arnett v. Kennedy, supra,* 416 U.S. at 181, 94 S.Ct. at 1657 ("Where Executive discretion is not limited, there is no need for a hearing." White, J., concurring and dissenting).

19. Judge (now Justice Stevens) applied this principle in *Miller v. School District Number 167, Cook County, Ill.* (7th Cir. 1974) 495 F.2d

658, *reh. denied* 500 F.2d 711. In that case a non-tenured teacher, without any legitimate expectation of renewal, protested the non-renewal of his contract of employment. The court found he had no property or liberty entitlement to a due process hearing. The School Board, however, gave him a hearing but only one where he could state his position, not one where he could be represented by counsel and confront and cross-examine the school officials. He refused to participate in the hearing under those conditions and appealed to the federal courts under a claim of denial of due process. The dismissal of the complaint by the district court was affirmed on appeal.

process hearing may be open to serious doubt." [20]

■ Even if the mere act of granting the plaintiff's request for a hearing did create in the plaintiff a right to some type of due process, it would not have given rise to the full range of trial-type due process rights which might arise in a discharge case where a party's livelihood was at stake [21] or in a criminal case where a party's liberty was at risk.[22] As Judge Haynsworth explained in *Thomas v. Ward* (4th Cir. 1975) 529 F.2d 916 at 919, "[d]ue process is a flexible concept, the very nature of which negates any concept of inflexible procedures universally applicable to every imaginable situation." Always the question is, as stated in *Morrissey v. Brewer* (1972) 408 U.S. 471 at 481, 92 S.Ct. 2593, at 2600, 33 L.Ed.2d 484, that "[o]nce it is determined that due process applies, the question remains what process is due." This is so because, as the court adds, "not all situations calling for procedural safeguards call for the same kind of procedure." [23] Thus, there are many situations where but minimal due process rights, limited at most to notice and right to be heard, are required. *Wolff v. McDonnell* (1974) 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 and *Goss v. Lopez* (1975) 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725, illustrate this principle. In *Goss* the court made a distinction in procedural due process rights in the student disciplinary context, dependent on whether there was a suspension or an explusion by the school of the pupil claiming due process rights. This simply illustrates that the extent of due process protection depends on the extent to which an individual will be "condemned to suffer grievous loss" as a result of the fundamental action complained of. *Joint Anti-Fascist Committee v. McGrath* (1951) 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J., concurring). And this issue turns on the nature of the property or liberty interests involved, since "[t]he relative weight of liberty or property interests is relevant, of course, to the form of notice and hearing required by due process." *Fuentes v. Shevin* (1972) 407 U.S. 67 at 90, n. 21, 92 S.Ct. 1983, at 1999 n. 21, 32 L.Ed.2d 556.[24] If neither a property nor a liberty interest is implicated, there is no threat of "grievous loss" and but an abbreviated right to due process exists.

■ In fact, the right to a due process hearing at all, where the action under review is a decision involving "academic evaluations," is doubtful, if not non-existent. Thus, in the recent case of *Board of Curators, Univ. of Mo. v. Horowitz* (1978) 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124, the Supreme Court suggested, if it did not flatly hold, that in an academic (as distinguished from a disciplinary) [25] dismissal "a

---

**20.** See also, *Kota v. Little* (4th Cir. 1973) 473 F.2d 1 at 3. Cf., however, *Horton v. Orange County* (4th Cir. 1972) 464 F.2d 536, which involved a charge of a racially discriminatory refusal to renew the contract of a nontenured teacher. Such a charge is different from that involved here and the one involved in *Jeffries*, in both of which there was no charge of racial discrimination, only a claim of an equal protection violation.

**21.** *Willner v. Committee on Character* (1963) 373 U.S. 96, 103, 83 S.Ct. 1175, 10 L.Ed.2d 224.

**22.** *Cafeteria Workers v. McElroy* (1961) 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230:
"* * * The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest."

**23.** See, also, *Carey v. Piphus* (1978) 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252, where the court speaks to the same point, declaring that in every due process case, the critical issue is represented by "deciding what process constitutionally is due in various contexts * * *."

**24.** See, also, *Mathews v. Eldridge* (1976) 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, where the court said that the extent of a due process right depended on "the private interest that [was] affected by the official action."

**25.** The rationale for the distinction between the disciplinary and the academic dismissal is obvious and is stated in *Horowitz*, as well as in *Dixon v. Alabama State Board of Education* (5th Cir. 1961) 294 F.2d 150, 158–59, cert. denied 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193, and *Greenhill v. Bailey* (8th Cir. 1975) 519 F.2d 5, 9, n. 11.

hearing is not required by the Due Process Clause of the Fourteenth Amendment." [26] It supported this conclusion with the following reasoning

"Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement. * * * The decision to dismiss respondent, by comparison, rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

"Under such circumstances, we decline to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing. The educational process is not by nature adversary; instead it centers around a continuing relationship between faculty and students, 'one in which the teacher must occupy many roles—educator, adviser, friend, and, at times, parent-substitute.' *Goss v. Lopez,* 419 U.S., at 594 [95 S.Ct., at 746] (Powell, J., dissenting). This is especially true as one advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized. In *Goss,* this Court concluded that the value of some form of hearing in a disciplinary context outweighs any resulting harm to the academic environ-

ment. Influencing this conclusion was clearly the belief that disciplinary proceedings, in which the teacher must decide whether to punish a student for disruptive or insubordinate behavior, may automatically bring an adversary flavor to the normal student-teacher relationship. The same conclusion does not follow in the academic context. We decline to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship. We recognize, as did the Massachusetts Supreme Judicial Court over 60 years ago, that a hearing may be 'useless or harmful in finding out the truth as to scholarship.' *Barnard v. Inhabitants of Shelburne,* 216 Mass. [19], at 23, 102 N.E. [1095], at 1097." (at pp. 89–90, 98 S.Ct. at p. 955).

It would seem that equally strong reasons would justify a denial of a due process hearing in the faculty promotion context. In both the case of the academic dismissal and of the denial of academic promotion, there is the exercise of subjective "academic judgment," which "requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." [27] Again, there is the same rationale for concluding "that considering all relevant factors, including the evaluative nature of the inquiry and the significant and historically supported interest of the school [or University] in preserving its present framework for academic evaluations, a hearing is not required by the Due Process Clause of the Fourteenth Amendment." [28] But, if it be assumed that, in some obscure way, the plaintiff in an academic promotion case has some procedural due process right, it is at most a very limited right, or, one calling "for far less stringent procedural requirements" than normally required in the trial-type situa-

---

**26.** 435 U.S. at 86, n. 3 and at 90, 98 S.Ct. at 953, n. 3 and at 955.

**27.** 435 U.S. at 89–90, 98 S.Ct. at 955.

**28.** 435 U.S. at 86, n. 3, 98 S.Ct. at 953 n. 3.

tion.[29] It unquestionably could not go beyond the right to know the ground for denial of promotion and an opportunity to present his reasons for feeling he was entitled to promotion. *Lee v. Ridgdill* (S.D. Fla. 1977) 444 F.Supp. 44, 47[30]; *cf. Goss v. Lopez, supra,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725. This was the extent of procedural due process granted the student who had been academically dismissed in *Greenhill v. Bailey,*[31] a case noted in *Horowitz.*[32] That same rule, it would seem, should apply in the case of the denial of academic promotion.

If, then, the standard of *Greenhill* were followed, the plaintiff has experienced in this case no denial of procedural due process. He knew the basis for his denial of promotion; he was given, not once, but twice, an opportunity to be heard in rebuttal before the Board of Trustees. Under the most extreme view of his due process rights, that was all he could demand and that he was given. There is no basis whatsoever in this case for a claim of a violation of due process, whether we follow the *Greenhill* view, or find that *Horowitz* is applicable in the academic promotion context, and thus that no hearing at all is required.

It follows that, taking the most favorable view of plaintiff's allegations, he has failed to state a constitutional claim which would support an action in his favor under § 1983.

For the foregoing reasons the judgment of the district court is

*AFFIRMED.*

**29.** 435 U.S. at 86, 98 S.Ct. at 953.

**30.** Nor did he have any right to complain that the president of the University and the department head were heard by the Board; such officials were under a duty to report to the Board, under the circumstances, on their recommendations. *Freeman v. Gould Special Sch. Dist. of Lincoln County, Ark.,* (8th Cir. 1969) 405 F.2d 1153, 1160, *cert. denied,* 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93.

**31.** 519 F.2d at 5.

**32.** 435 U.S. at 85–86, n. 2, 98 S.Ct. 948.

The Supreme Court, as its comments on this case indicated, has decided against any right in the dismissed student to " 'representation by counsel, confrontation, and cross-examination of witnesses,' " the very rights claimed by the plaintiff in this case. 435 U.S. at 85, n. 2, 98 S.Ct. at 953 n. 2.

In *Greenhill,* the court found a factual basis for finding that the action operated as a stigma and, therefore, gave the pupil a right to some form of due process. There is no such situation here, though.