No. 81-10

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

_____

M. IQBAL AKHTAR,

Plaintiff and Appellant,

vs.

JOHN E. VAN DE WETERING et al.,

Defendants and Respondents.

_____

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Boschert and Boschert, Billings, Montana
Rosemary Boschert argued, Billings, Montana

For Respondents:

LeRoy H. Schramm argued, Helena, Montana

_____

Submitted: December 1, 1981

Decided: MAR 3 1982

Filed: MAR 3 - 1982

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

M. Iqbal Akhtar initiated this action following denial of his tenure at Eastern Montana College (EMC). He sought reinstatement with tenure and backpay, claiming violations of sections 49-3-101(1)(2) and 49-3-201, MCA; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000c; and equal protection rights secured by Article II, Section 4, of the Constitution of the State of Montana and the Fourteenth Amendment to the United States Constitution. The District Court found the denial of Dr. Akhtar's tenure application resulted from the defendants' exercise of academic judgment and did not discriminate against Dr. Akhtar either individually or as a member of a class. From that decision, Dr. Akhtar appeals.

Appellant is an assistant professor in the Department of Economics of EMC, where he has taught since his appointment there in September 1975. He is a naturalized citizen of the United States and a former citizen of Lyallpur, Pakistan. Akhtar received his PhD degree in agricultural economics from Texas A & M University in 1967. Prior to his appointment at EMC appellant taught one year at Middle Stand State University and one semester at Idaho State University.

Appellant applied for tenure according to the faculty contract procedure in October 1978. He submitted his application to the unit rank and tenure committee. After consideration, the committee made a positive recommendation to the college rank and tenure committee.

On or about January 15, 1979, Robert McRae, Dean of the Liberal Arts School, forwarded an unfavorable recommendation regarding the appellant's tenure application to

the College Rank and Tenure Committee and a copy of that recommendation to Larry W. Jones, Academic Vice-President.

The College Rank and Tenure Committee sent a favorable recommendation regarding appellant's tenure application to the academic vice-president on or about March 1, 1979.

The academic vice-president forwarded appellant's application with the academic vice-president's negative recommendation to President John Van de Wetering on or about March 28, 1979.

The president informed appellant of his decision not to award tenure on April 17, 1979.

On May 1, 1979, the president received a letter from Professor Harry Gaghan, Chairman of the Department of Social Sciences, on behalf of the department, requesting the president to reconsider his decision and protesting the use of the student evaluation instrument.

The president requested a reevaluation of appellant's application excluding the student evaluation test from consideration.

On May 16, 1979, Dean McRae submitted his reevaluation of appellant's application to Vice-President Jones, indicating Dean McRae's recommendation remained unfavorable.

On May 17, 1979, the vice-president submitted his reevaluation to the president which reaffirmed his negative recommendation. The president then reaffirmed his denial of tenure to appellant.

Several issues are before this Court:

1. May appellant's claim of denial of due process rights properly be heard on appeal?

2. If so, was appellant denied guaranteed due

process when he was denied tenure?

3. Was appellant denied equal protection guarantees in that he was treated differently than other similarly situated candidates for tenure and promotion at EMC?

4. Did the District Court err in refusing to receive into evidence and hear testimony on plaintiff's Exhibit No. 25, a report from an appeals committee in the tenure matter of Dr. Jerome Hurley?

5. Did the District Court err in refusing to allow the testimony of Maury Evans regarding union activities of Dr. Akhtar and other faculty?

6. Did the District Court err in refusing to allow the rebuttal testimony of Dr. Jay Kirkpatrick?

Respondents argue appellant's due process claim may not properly be heard on appeal since it was not raised at the trial court. An issue which is presented for the first time to the Supreme Court is untimely and cannot be considered on appeal. Northern Plains v. Board of Natural Resources (1979), _____ Mont. _____, 594 P.2d 297, 36 St.Rep. 666. The question before us, then, is whether appellant raised the due process issue below.

Appellant's complaint alleges violations of sections 49-3-101(1)(2) and 49-3-201, MCA; Title VII of the Civil Rights Act of 1964; and the equal protection guarantees of the Fourteenth Amendment to the Constitution of the United States and Article II, Section 4, of the Constitution of the State of Montana. The complaint was never amended and makes no reference to due process violations.

Appellant does, however, refer to due process extensively in both his trial brief and his proposed conclusions

-4-

of law. And, the District Court states in its Finding of Fact No. 9: "Plaintiff alleges that he was discriminated against in regard to said tenure application and that he was not accorded the same protection and due process that was accorded other faculty members . . ." We find this a sufficient indication of the presence of the due process issue at the trial level to consider it on appeal.

Appellant claims his due process rights were violated because (1) he was not given adequate notice and hearing prior to the denial of his tenure application, and (2) the decision to deny tenure was arbitrary and capricious and founded on a violation of appellant's equal protection rights.

The first question to be answered is whether appellant had a property or liberty interest which is accorded due process protection by the Fourteenth Amendment to the United States Constitution and Article II, Section 17, of the Montana Constitution. Board of Regents v. Roth (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; Schend v. Thorson (1976), 170 Mont. 5, 549 P.2d 809; Reiter v. Yellowstone County (1981), ____ Mont. ____, 627 P.2d 845, 38 St.Rep. 686. Only if such an interest is established, may the question of whether due process protections have been violated be considered.

Appellant claims the denial of his tenure request violates a liberty interest by imposing a stigma on him which impairs his freedom to obtain other employment. He makes no claim of false or defamatory statements being publicized about him in connection with his tenure evaluation but grounds his claim on the sole fact tenure was

denied.

In Roth, supra, the United States Supreme Court considered the case of an untenured university teacher hired for a fixed one-year term. State statute provided tenure status was available only after four years of year-to-year employment. Nevertheless, Roth claimed denial of his due process rights because he was given no notice or hearing prior to his nonretention.

The Court found Roth had not been denied a liberty interest because the state had not imposed any stigma on him which deprived him of other employment opportunities nor had it impinged his "good name, reputation, honor or integrity." 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 559.

More recently in Bishop v. Wood (1976), 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684, a permanently employed policeman was discharged without a pretermination hearing. He claimed a due process violation because of a city ordinance which limited the grounds for discharge of permanent employees to inefficiency, negligence, unfitness or failure to perform duties. The Court said the fact that an employee's discharge made him less attractive to other employers was not alone a deprivation of a liberty interest.

While the fact appellant did not receive tenure at EMC will not benefit him in his pursuit of other employment, it does not place such a stigma on him as to deprive him of a liberty interest.

Appellant also claims a protected property interest. Roth, supra, sets out a guide to determining such an interest. In Roth, the Court held:

> ". . . To have a property interest in a
> benefit, a person clearly must have more than

-6-

> an abstract need or desire for it. He must
> have more than a unilateral expectation of
> it. He must, instead, have a legitimate
> claim of entitlement to it . . ." 408 U.S.
> at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561.

The source of an entitlement establishing a property interest may be found in state law or in rules and understandings existing between the individual and his employer. Roth, 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561.

In Roth's companion case, Perry v. Sinderman (1972), 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570, a teacher had taught in the Texas state college system for ten years under a series of one-year contracts. When, following his public disagreements with college policies, his contract was not renewed, the teacher brought an action claiming the decision infringed his right to freedom of speech and denied him procedural due process. The Court found that, even without a formal contractual tenure provision, a protected property interest may exist through a de facto tenure agreement promulgated by rules and understandings of state officials. The Court also noted the likelihood of the existence of such a de facto agreement is greater where no explicit tenure system exists. 408 U.S. at 602, 92 S.Ct. at 2700, 33 L.Ed.2d at 580.

Appellant argues that, having taught the requisite number of years and obtained the academic rank of assistant professor, he has satisfied the objective requirements for tenure at EMC and thereby has sufficient entitlement to tenure to require due process protections.

Appellant relies primarily on McLendon v. Morton (W.Va. 1978), 249 S.E.2d 919, in which an assistant professor at a community college sought a writ of mandamus

claiming she was denied due process in the college's decision not to grant her tenure. The college's tenure regulations required the rank of assistant professor, six years of teaching service and full-time employment status in order to be eligible to apply for tenure. The further criterion for obtaining tenure, according to the regulations, was teaching competence.

The West Virginia court considered whether the claimed property interest was a unilateral expectation or an entitlement. It noted that existing rules or understandings between the institution and the individual could give rise to a legitimate claim of entitlement and held that satisfaction of the basic eligibility standards to apply for tenure gave a sufficient entitlement to require due process protection. 249 S.E.2d at 925.

In adopting its position, the West Virginia court recognized it was establishing a rule more restrictive than that of the United States Supreme Court and that it was guided by its distinctive state constitutional due process provision, 249 S.E.2d at 922. That provision states:

"No person shall be deprived of life, liberty or property without due process of law and the judgment of his peers." West Virginia Constitution, Article III, Section 10.

As was established by this Court in Schend v. Thorson, supra, the question is one of whether a right has become vested. Only then is it protected by due process. This Court found there that a probationary police officer had no property right under Montana law and could have none until confirmation of his position as a permanent employee.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a

-8-

person has already acquired in specific benefits." Roth, 408 U.S. at 576, 92 S.Ct. at 2708, 33 L.Ed.2d at 560.

The policies of Eastern Montana College required faculty members applying for tenure to present evidence showing excellence in teaching, research and public service. Given this requirement beyond the quantitative standards required for eligibility, we find that a protected right to tenure did not vest with appellant's eligibility alone. His satisfaction of the quantitative requirements simply entitled him to consideration for tenure but did not, on its own, establish an entitlement sufficient to constitute a protected property interest.

Appellant also cites as sources of his claimed property interest the 1975-1977 faculty contract, which was extended through 1978, the codification of rank and tenure matters and the "traditional and promulgated policy of the institution."

The faculty contract sets out the rules and criteria for tenure; the codification clarifies the contract tenure provisions; and the policy to which appellant refers is the "Final Report on Promotion and Tenure for 1977-78" issued to the faculty by EMC President Van de Wetering. Among other things, the report refers to the primary responsibility of faculty colleagues in the faculty renewal review process.

In essence, appellant argues that with the existence of these tenure procedures and policies he acquired a protected property interest in them.

Appellant relies on three cases to support this claim: Hillis v. Meister (1971), 82 N.M. 474, 483 P.2d 1314; Abramson v. Board of Regents University of Hawaii

(1976), 56 Haw. 680, 548 P.2d 253; and Ofsevit v. Trustees of the California State University and College, et al. (1978), 148 Cal.Rptr. 1, 21 Cal.3d 763, 582 P.2d 88.

These authorities are not persuasive in this instance. Hillis, supra, interpreted the teaching contract between an assistant professor and Eastern New Mexico University. The court found that through the course of conduct of the parties, the provisions of the faculty handbook had become part of their contract. The court did not consider whether the contract constituted a property interest.

In Abramson, supra, the Supreme Court of Hawaii found that the published tenure policy of an educational institution might be incorporated into the employment contract of a probationary faculty member. The court found, however, the tenure provisions of the faculty handbook had no force of law because there had been no showing of compliance with the rule-making procedures of the state's administrative procedure act in establishing the provisions. The court also found that none of the written policies of the university provided assurance of continued employment so as to establish a protected property interest.

The Supreme Court of California, in Ofsevit, supra, found that a faculty member had been improperly denied reappointment at San Francisco State University on the basis of his political activities in violation of his First Amendment rights. Although the court found teachers were entitled to enforcement of the rules and regulations adopted by a board of education because they were in effect part of the teaching contract, it made no finding of a constitu-

tionally protected property interest.

Through these cases appellant argues that rules and regulations which have been adopted by an institution of higher education are impliedly or expressly part of a faculty member's employment contract and, as such, are the source of his claimed property interest.

As applied to this case, appellant's argument raises three questions: Were the codification and the president's statement part of the faculty contract? Were the contract procedures followed? If not, does the contract establish a protected property interest?

This Court recently held that an employee handbook distributed after an employee is hired does not become part of that employee's employment contract. Gates v. Life of Montana Insurance Co. (1982), ___ Mont. ___, 638 P.2d 1063, 39 St.Rep. 16. Gates claimed her employment contract had been breached because provisions of the employee handbook had not been followed. This Court found the handbook constituted a unilateral statement of company policies. The handbook terms were not bargained for and there was no meeting of the minds. The Court also found the handbook was not part of Gates' contract when she was hired and did not constitute a modification of the contract because there was no new and independent consideration for its terms. Gates, 638 P.2d at 1066, 39 St.Rep. at 19.

The codification on which appellant relies was drafted by the Rank and Tenure Committee specifically to clarify both the faculty contract and handbook. The document was approved by the Coalition/Administration Committee as not in conflict with the contract or handbook.

The document also was specified as the operating manual for the Rank and Tenure Committee, limited to reference and informational use and subject to future contract negotiations. Although the codification is by its nature a pseudo-extension of the contract, using the Gates rationale, it is not part of the contract.

The faculty contract specifies a procedure for granting tenure which is set out below:

"The procedure for granting tenure shall be as follows:

"(1) A committee of the appropriate administrative unit, which shall include tenured faculty members, if available, and including the Administrative Unit Head, shall recommend to the Rank and Tenure Committee the names of those eligible members of the unit whom they consider to be qualified for tenure. The recommendation of the appropriate administrative unit committee shall be completed no later than December 1, and by that date the appropriate administrative unit committee shall notify in writing the eligible faculty members who have not been recommended for tenure and the committee shall send a copy of the notice to the President, but the applications of all eligible faculty members shall be forwarded to the Rank and Tenure Committee.

"(2) The College Rank and Tenure Committee shall review all tenure applications received from the units and shall, by March 1, submit its recommendations (positive or negative) to the Academic Vice President.

"(3) Those recommendations which are approved by the President shall be submitted to the Board of Regents for final action. Upon Board of Regents approval, the affected faculty members shall be awarded tenure effective with the commencement of the next academic year.

"(4) No faculty member shall be awarded tenure solely because the aforesaid procedures were not followed. The President shall have the right to act independently if the committee(s) fail to act within the time limit specified."

The primary breach of procedure claimed by appellant

is an unfavorable recommendation which was forwarded by the Dean of the Liberal Arts School to the academic vice-president out of proper sequence. Appellant argues that according to the procedure, the dean's letter should have been forwarded to the College Rank and Tenure Committee and then, together with all recommendations, to the academic vice-president. Instead, the academic vice-president received the dean's unfavorable recommendation and, only later, received the committee's favorable review.

The sequence to which appellant refers, however, is specified not in the contract document but in the codification. Assuming arguendo that the codification was part of the contract, we still find no breach. The codification provision regarding the deans states: "The Rank and Tenure Committee will then request the respective deans to examine each applicant's package by December 15, and make a written recommendation on each one." Here, the dean made the requested recommendation to the committee and sent a copy of his recommendation to the academic vice-president. The codification did not restrict or preclude the dean's action, and we find no breach of appellant's contract procedure.

The president's statement, which appellant contends is a "published policy" and therefore part of his contract, was made May 23, 1977 via a memorandum entitled Final Report of Promotion and Tenure for 1977-78. The report included a statement of the basis upon which the president reviewed promotion and tenure cases that year. The president acknowledged the importance of the recommendation of the candidate's department colleagues in these matters and stated: "It would be inappropriate for me to interfere with

that recommendation for other than procedural reasons except under extraordinary circumstances."

This statement was made at a time of flux in the EMC administration when the college had no administrative vice-president and President Van de Wetering was the only administrative step in the process. The statement also was made before the contract codification was completed. The statement was not intended to be or presented as a strict and on-going policy and given the context in which it was made cannot logically be construed as such.

Regardless of the title given to the statement, however, we find the president's action not contradictory to it. In fact, the circumstances the president faced here were extraordinary. No reasonable construction of the president's statement could infer an intent to procedurally ignore the recommendations of members of the administration in all cases. President Van de Wetering testified that ordinarily the tenure applications he received had consistent recommendations. Here, he was faced not only with inconsistent recommendations but also with a tie-vote that necessitated his final determination contradict with the recommendations of two of the four reviewing bodies. Given this situation, the president requested both the dean and the vice-president to reevaluate Dr. Akhtar's application excluding the student evaluation. Their recommendations remained the same. The president then considered all the information before him and determined that Dr. Akhtar should not receive tenure. We find the president's actions did not contradict his statement nor did they breach appellant's contract.

-14-

This Court recently held, in Keiser v. Board of Regents (1981), ___ Mont. ____, 630 P.2d 194, 38 St.Rep. 674, that the provisions of a tenured professor's employment contract which set out salary and contract term were tenured along with academic rank. The Court's concern there was construction of the employment contract which granted Dr. Keiser "continuous tenure." The Court's decision was based, in part, on a two-fold purpose of tenure: academic freedom and economic security.

Keiser is not, however, applicable to the case before us. There, Dr. Keiser had been granted tenure. Her property interest in that tenure clearly had vested and the question to be resolved was what tenure consisted of. Here the question is an entirely different one--whether a protected right has vested.

Dr. Akhtar applied for tenure at Eastern Montana College according to the formal tenure procedures. Those procedures provided for evaluation of the tenure applicant at the time of application on the basis of excellence in teaching, research and public service, and community service. The procedures did not establish a legal expectancy in continued employment but rather set out a means by which a discretionary decision would be made. We find no property interest requiring due process here.

Appellant specifies as error the District Court's failure to adopt appellant's proposed conclusion of law number seven which states respondents' conduct violated Article II, Section 4, of the Montana State Constitution and the Fourteenth Amendment to the United States Constitution in that appellant was treated differently than other simi-

larly situated candidates for tenure and promotion at EMC.

While neither party specifically argues the equal protection issue on appeal, it appears to be merged in the other considerations before us. For that reason, we will consider it here.

The Board of Regents has general control and supervision of the Montana university system including a duty to appoint both president and faculty for each institution. Section 20-25-301(1)(11), MCA. The president of an individual institution, in turn, is charged with the immediate control and management of that unit. Section 20-25-305(1), MCA.

The tenure system is among the procedures maintained under this authority. Therefore, actions by the president and the Board of Regents regarding tenure are state actions, and a discriminatory application of the tenure process would result in an unconstitutional denial of equal protection. U.S. Const., Amend. XIV, Section 1; Mont. Const., Art. II, Section 4.

Appellant claims he was discriminated against in that he was treated differently from other tenure candidates because a different standard of excellence was applied to his tenure evaluation than to others. In support of his claim, appellant points most specifically to comparisons of his and other candidates' publication record. Since his employment at Eastern Montana College, appellant had published one article. Two candidates who had published no articles while at EMC were granted tenure.

We agree with the Fourth Circuit which found that "not every difference in promotion treatment—particularly a

-16-

difference not in resolving questions of primary facts but in evaluating facts—rises to the level of constitutional deprivation either under equal protection or due process." Clark v. Whiting (4th Cir. 1979), 607 F.2d 634, 638.    In Clark, an associate professor claimed he was denied equal protection because different standards were used in evaluating his promotion qualifications than were used in passing on promotions of other faculty members.

At EMC the evaluation of tenure candidates was made in three basic areas: teaching, research and public service, and community service.    Publication was one of a number of factors considered in the process.

Dean McRae testified that he evaluated all eight tenure candidates using the basic criteria of teaching, research and service and attempted to measure their performance in each category in at least a partially quantifiable manner.    Because of the inevitability of some subjectivity in the process, the dean testified he made a composite for each candidate and then reevaluated the materials submitted to him.    He then developed a rank order of the candidates in which Dr. Akhtar ranked eighth.

President Van de Wetering testified that the tenure evaluations demanded a weighing and balancing of all the areas of consideration for all the candidates.    Although there was sharp disagreement among appellant's colleagues, the final determination was that appellant's professional performance did not meet the overall professional academic standards needed to grant tenure.

The District Court concluded the denial of tenure was not arbitrary but was an exercise of academic judgment.    It

also found no evidence had been presented which indicated the denial resulted from discrimination or that the procedures followed were intended to penalize a certain class. We agree.

The state has a strong interest in maintaining the quality and academic freedom of its higher education system. The tenure process serves that dual purpose, and evaluating a number of areas of performance provides a broad basis for determination.

Absent an arbitrary or discriminatory treatment of appellant's tenure application, we can find no denial of equal protection.

Appellant contends the District Court erred in refusing to receive into evidence and hear testimony on his Exhibit No. 25, a report from an appeals committee in the tenure matter of Dr. Jerome Hurley. We disagree.

The evidence was refused by the District Court for lack of relevance. Appellant argues the evidence was relevant in that it would have shown "a pattern of procedural error, the prejudice and the factual error that tainted [his] tenure process from the beginning."

Evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Rule 401, Mont.R.Evid.

Here, the existence of a pattern of procedural error which appellant claims would have been shown by the evidence was not at issue. The appeals committee whose report the appellant offered was not in existence during Dr. Akhtar's

tenure evaluation. Whether the academic vice-president acted impermissibly in the tenure application process of a different individual under a different contract in a different academic year is not relevant to his actions in appellant's tenure evaluation.

Appellant also claims the District Court erred in refusing to allow the testimony of Maury Evans regarding union activities of Dr. Akhtar and other faculty. This evidence too was refused by the District Court as irrelevant.

Appellant made an offer of proof through the testimony of Maury Evans that one member of Eastern Montana College faculty who applied for tenure at the same time Dr. Akhtar did was an active member of the AAUP, the college's faculty organization, and its negotiating team; he resigned from the negotiating team shortly before he applied for tenure which he was granted; Dr. Akhtar, who remained active in his union, was not granted tenure.

Appellant claimed in the original complaint a violation of section 49-3-201, MCA, which requires evaluation and promotion of state and local government officials be made "on the basis of merit and qualifications without regard to . . . political ideas . . ." It is apparent that certain political ideas could be inferred from union activity, and, therefore, the offered evidence was relevant to a fact at issue.

The offered testimony, however, would have shown only that Maury Evans resigned from his position on the union negotiating team, not from the AAUP, prior to his tenure application and that he was granted tenure. Had the evidence

been admitted, it would have shown that one union member was granted tenure and another was not. We affirm the District Court's ruling.

Respondents specify as cross-error the District Court's refusal to admit Dr. Jay Kirkpatrick's testimony regarding a statement attributed to him by Dr. Akhtar.

During Dr. Akhtar's direct examination, the following exchange took place:

> "Q. After you were denied tenure, did Jay Kirkpatrick make any statements as to reasons for the denial?
>
> "A. Yes Ma'am, at one occasion he said that, oh Dr., he is a fine fellow. I like him very much, but he has been associated with the wrong people. Another occasion, he said that if in politics you are caught on the wrong end of the fence, that's what you get, and that's exactly what he got."

No objection was raised at that time to either the question or the answer.

Later in the trial Kirkpatrick was called by respondents in rebuttal to Akhtar's testimony. In that context, respondents' counsel questioned Kirkpatrick regarding the statement Akhtar attributed to Kirkpatrick: "Do you recall having a conversation with Mr. Akhtar?" Appellant's counsel objected claiming Kirkpatrick's testimony was limited to rebuttal and Akhtar had not testified about any conversation between Akhtar and Kirkpatrick. Following an overruling of the objection, respondents' counsel asked Kirkpatrick whether he had a conversation pertaining to the decision to deny Akhtar tenure. Kirkpatrick answered that he had such a conversation with a personal friend of Akhtar and a local veterinarian. At that point the court asked Kirkpatrick whether the conversation involved Akhtar. When Kirkpatrick

-20-

responded that Akhtar had not been present, the court sustained appellant's previous objection.

The source of this issue is appellant's reference to statements by Kirkpatrick which is set out above. No objection was made to appellant's statement when it was made. Therefore, this Court will not determine error. Green v. Green (1978), 176 Mont. 532, 579 P.2d 1235; Dieruf v. Gollaher (1971), 156 Mont. 440, 481 P.2d 322.

Appellant's attribution of statements to Kirkpatrick, in fact, did not indicate to whom they were made. The question then becomes whether Kirkpatrick's offered testimony was properly within the scope of rebuttal. Respondents argue Kirkpatrick would have testified that the context of the statement appellant attributed to him was a discussion of appellant's adherence to the no-research, no-publication philosophy of a faction of the EMC faculty. In that context, according to respondents, Kirkpatrick would have testified he had discussed his disappointment with appellant's research and publication record.

While respondents carefully set out this argument in their brief, they made no such offer to the District Court. In the absence of an offer of proof to the District Court, this Court will not review the ruling. Tague v. John Caplice Co. (1903), 28 Mont. 51, 72 P. 297; Trogdon v. Hanson Sheep Co. (1914), 49 Mont. 4, 139 P.2d 792; Runkle v. Burlington Northern (1980), ___ Mont. ____, 613 P.2d 982, 37 St.Rep. 995.

Affirmed.

John Conway Harrison
Justice

-21-

We concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
Honorable Robert M. Holter,
District Judge, sitting in
place of Mr. Justice Sheehy

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent from the majority opinion.

I do not take issue with the facts as they are set forth in the majority opinion. However, they need to be supplemented.

In addition to the facts set forth in the majority opinion, it is important to note that the appellant, M. Iqbal Akhtar, signed a contract for the school year 1978-79. On May 23, 1977, the president of Eastern Montana College issued a memorandum containing tenure policy. That document provided, in part:

> "By long tradition, the primary responsibility
> for tenure decisions must rest with one's
> colleagues in his department for they are
> best qualified to judge the probationary faculty
> member and to assess his role in the plans for
> the future of the department. The AAUP 'Red-
> book' upon which much of the Collective Bargain-
> ing Contract has been based states clearly, page
> nine, 'Statement on Procedural Standards in
> the Renewal or Non-renewal of Faculty Appoint-
> ment', that 'Faculty status and related matters
> are primarily a faculty responsibility. Any
> recommendation regarding renewal of tenure
> should be reached by the appropriate faculty
> group in accordance with procedures approved
> by the faculty.' The 'Redbook' further states
> that 'The conscientious judgment of the candi-
> date's departmental autonomy in professional
> judgments is to prevail.' (p.12) It would
> be inappropriate for me to interfere with
> that recommendation for other than procedural
> reasons except under extraordinary circumstan-
> ces." (Emphasis added.)

The appellant was denied tenure although he received a favorable recommendation from the college "rank and tenure committee." Under the previously announced policy such action would only be taken where it appeared to the president that "extraordinary circumstances" existed for overriding the committee's recommendation.

The effect of such an announced policy was the subject

of discussion by this Court in Gates v. Life of Montana Insurance Co. (1982), 39 St.Rep. 16, and Nye v. Department of Livestock (1982), 39 St.Rep. 49. In Gates, the employer had promulgated certain personnel policies subsequent to the time the employee was hired. The Court held such promulgated policies were not part of the employment contract, but the employee was entitled to the benefit of those policies. The following excerpt is taken from the Court's opinion:

> "The circumstances of this case are that the employee entered into an employment contract terminable at the will of either party at any time. The employer later promulgated a handbook of personnel policies establishing certain procedures with regard to terminations. The employer need not have done so, but presumably sought to secure an orderly, cooperative and loyal work force by establishing uniform policies. The employee, having faith that she would be treated fairly, then developed the peace of mind associated with job security. If the employer has failed to follow its own policies, the peace of mind of its employees is shattered and an injustice is done.

> "We hold that a covenant of good faith and fair dealing was implied in the employment contract to the appellant. There remains a genuine issue of material fact which precludes a summary judgment, i.e., whether the respondent failed to afford appellant the process required and if so, whether the respondent thereby breached the covenant of good faith and fair dealing." Gates, 39 St.Rep. at 20. (Emphasis added.)

The crux of Gates is that, once an employer has announced a policy, the employer must follow the policy even though it is not part of the employment contract. We held that "good faith and fair dealing" mandates such a process.

In Nye, a state employee was promoted and then fired. One issue on appeal was whether a claim for "wrongful discharge" could lie. This Court held that employment policies must be followed and that failure to do so may render the employer liable for the tort of "wrongful discharge." The employee involved was subject to "termination at will." The following

excerpts are taken from the Court's recent opinion:

> "The determination of whether the cause of action arises rests upon whether an unfair or unjustified termination was in violation of public policy.
>
> ". . .
>
> "Policy 3-0130 states that 'when punitive discipline is necessary, just cause, documentation of facts and due process are required.'
>
> "We find that the Department of Livestock failed to apply its own regulations to Margaret Nye, and therefore violated public policy." Nye, 39 St.Rep. at 53-54.

We held in Nye that an employer, who fails to follow its own employment policies, may be liable for wrongful discharge. Gates and Nye, taken together, have expanded the Montana law pertaining to employer-employee relationships. The law enunciated in these two cases controls the outcome of Akhtar v. Eastern Montana College.

The record in the case before us is devoid of evidence which could constitute "extraordinary circumstances." Under the employment policy articulated by the college president on May 23, 1977, "extraordinary circumstances" provide the only basis for overriding a recommendation of the rank and tenure committee. Here, the recommendation of the committee was not followed, and no extraordinary circumstances were shown.

Although this appellant sought tenure and was denied, the result of the process was to terminate his services. The case cannot, therefore, be distinguished from Gates and Nye.

I would remand this case to the administrative level with instructions to implement the existing college employment policies and make appropriate fact findings.

Justice

I join in the dissent of Justice Morrison.

Justice

-25-