884 F.2d 1389
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Patricia MASON, Plaintiff-Appellee,
v.
CITY OF GASTONIA, Bob Adams, Joe Davis, Roger Kayler, Henry
Cannon, Ronnie Ransom, Glendell Brooks, Gary
Hicks, Jim Philyaw, W.B. Brooks,
Defendants-Appellants.
Patricia MASON, Plaintiff-Appellee,
v.
CITY OF GASTONIA, Bob Adams, Joe Davis, Roger Kayler, Henry
Cannon, Ronnie Ransom, Glendell Brooks, Gary
Hicks, Jim Philyaw, W.B. Brooks,
Defendants-Appellants.
 Nos. 88-2861, 88-2924.
 United States Court of Appeals, Fourth Circuit.
 Argued June 7, 1989.
Decided Aug. 16, 1989.
Rehearing and Rehearing In Banc Denied Oct. 3, 1989.
 
 Charles Fogle Vance, Jr., Margaret Ann Anderson (Richard L. Rainey, Womble, Carlyle, Sandridge & Rice, Henry M. Whitesides, Whitesides, Robinson & Blue on brief) for appellants.
 John W. Gresham (C. Margaret Errington, Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A. on brief) for appellee.
 Before DONALD RUSSELL and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 This is a public employee's action under Section 1983[1] for redress of the failure to accord her due process in the suspension and termination of her employment. It was submitted to the jury in a district court trial. The jury found that the plaintiff's discharge violated plaintiff's due process rights and returned a verdict in favor of the plaintiff. The defendant appealed. On appeal, we remanded the case to the district court to determine whether the applicable City Ordinance on personnel granted the plaintiff due process rights. The district court decided the Ordinance did vest the plaintiff with such rights and reaffirmed the earlier judgment, without considering the question, accepting that the plaintiff had due process rights, whether she had been accorded such rights by the City in the proceedings which resulted in a decision of termination. The defendants have appealed the final judgment on two grounds: (1) the plaintiff, under the controlling City Ordinance, had no due process rights since her employment was at will; and (2) that, even if she had, the plaintiff's due process rights were satisfied by the City procedures. We reverse on the City's second ground and find no need to resolve the first issue posed by the City.
 
 I.
 
 2
 The plaintiff, Patricia Mason, worked for the City of Gastonia in a clerical capacity for approximately eight years prior to her termination on September 14, 1983. She had been transferred from the Billing Division to the Collections Division as the clerical supervisor of that Division in April of 1983. Her immediate supervisor was Blair Wilson, who in turn reported to James Philyaw, the City's finance director. The duties of the plaintiff as the clerical supervisor contemplated responsibility for the security of the collections received by the several tellers in the Collections Division. It was her duty "to close out the tellers as their payments came in daily," to see that the tellers put their drawer in the cash safe, to check the tellers' stations, to "see that all the drawers at the station[s] were locked" and "to sign behind everyone of their initials on a checklist." The safe provided by the City was for the deposit of all cash collections at the close of business each day. The combination for the safe was to be set by the plaintiff, who was to change it periodically. She was to record the combination as selected by her on three sheets of paper, which, after being folded, were to be enclosed separately in three City of Gastonia envelopes. These envelopes were to be sealed with "my (Mason's) initials over the seals." One of the envelopes was to be given to Mr. Philyaw, a second to Mr. Wilson, and the third was to be retained by Ms. Mason.
 
 
 3
 The plaintiff testified that she was advised of the procedure to be followed by her in seeing to the security of the City's cash collections at a meeting attended by her, at which the City Manager, Mr. Hicks, Mr. Philyaw, Mr. Wilson, and a Mr. Presley, an accountant who had devised the system when she was transferred to the Billing Division. It was explained to the plaintiff that the City had been troubled in the past by laxity in the handling of cash in the Collections Division. On one occasion, the safe in which the collections of the Division were to be placed for safekeeping at the end of the work day was found open and a substantial amount of money was missing. There was a great deal of public criticism of the laxity in the security at the time. The City officials were greatly embarrassed by this disclosure. An open safe was also discovered after closing shortly before the plaintiff was transferred. Mrs. Sandy York was at the time the clerical supervisor having the same responsibility as the supervisor in the Collections Division as the plaintiff was to have as her successor. She was given a suspension without pay, removed as clerical supervisor in the Collections Division, and transferred to another Division. All of these details were made known to the plaintiff, who was told in addition that "we can't let this [i.e., the safe door being open after the office had been closed] happen again," that "the doors have to be locked, the drawers have to be locked up, no checks laying around any more, those papers have to be signed at the end of each day." Finally, Mr. Philyaw and Mr. Wilson "emphasized to [the plaintiff] the importance of making sure everything was secure" and that the City 'was not going to have any more mess [such as the safe being left open]" because "they were tired of being embarrassed."
 
 
 4
 About fifteen minutes after the close of business on September 14, 1983, Mr. Philyaw went in the Collections room and discovered the safe open. Mr. Wilson and the plaintiff were called and requested to come to the City's offices at once. Two police officers of the City were brought in. An investigation immediately began. The officers first examined the safe, its handle and locks for fingerprints. There were none. They examined the Collections Office where the safe was located. There were two windows in the office. One was securely locked; the other was not locked but they found no "visible sign of forcible entry." The envelopes with the safe's combination, which had been given to Mr. Philyaw and Mr. Wilson, were examined; the seals were unbroken. Both Wilson and the plaintiff said they had closed the safe as required, but they could offer no explanation how the safe was found open within a few minutes after they had allegedly closed the safe. The officers took a statement from Philyaw and Wilson, and two statements, a day apart, from Ms. Mason. Later, Ms. Mason was asked about the combination of the safe. She said first she kept the combination in her head but quickly amended this statement, "I do have it [the combination] in my pocketbook, my billfold. I have it this time because I've recently changed it a month or so ago because I had been out and when I changed it, I keep it sometimes I am afraid I will forget it in the morning so I have it. I do have it in my billfold."
 
 
 5
 In her first interview, Ms. Mason explained the procedure followed in closing the safe and then, after giving her steps in closing the safe, said that normally "I will turn around and go back in there and check and make sure everything is turned off but today [September 14], I did not go back in there. I don't do it everyday but, today, I didn't go back in there. Most of the time, I do. Today, I didn't." The next day she was asked by the investigating officers:
 
 
 6
 Q. "Thinking back of yesterday, remembering about closing the safe or anything, is there any doubt whatsoever in your mind as to whether or not you closed that safe? Do you have any doubt at all?
 
 
 7
 A. No, I think I might have thought I did last night when I was talking to ya'll but, when I got home, I was just sitting there thinking and I could see myself. I know the very words I said when I pushed the handle and right before I turned it, I turned around and I said, is that it? Because like I said I've locked it before and have to open it again because one of the tellers hadn't put some money in it. And, I said, is that it and when they say yes, that's it, I turned around and I'm turning the dial. I got my hands on it all the time I'm saying it. And usually, Blair's standing right behind me when I'm saying this, or right around me.
 
 
 8
 CROSBY: But, particularly last night, you can't remember exactly where Blair was when you closed it.
 
 
 9
 MASON: He was back there but, I don't know exactly where he was standing.
 
 
 10
 The officers also interviewed and took statements from the three tellers. It is intimated by the plaintiff that one of these tellers, Ms. Platt, had said she had seen Ms. Mason close and lock the safe on the evening of September 14. The actual statement of Ms. Pratt in response to the investigator's direct question, "Did you see her [Ms. Mason] secure the safe," was:
 
 
 11
 I didn't see Pat but Pat does the safe first and then Blair does Pat's. Now, I was the last one locking up. Blair was standing there beside the safe as usual waiting for me to lock my drawer inside the safe and Blair was standing there so, when I turned around, Pat was already at my station giving it a third check. All my drawers was locked because I saw Pat jerk on them. When I turned around to go to her desk to sign my name and the time, that's when I saw Blair--he was over there jerking on the handles. You know, you can hear it, you know. He gives it a jerk.
 
 
 12
 It is obvious that Ms. Pratt did not testify she saw Ms. Mason close the safe.
 
 
 13
 On September 16, 1983, Mr. Philyaw made a report of the incident to the Mayor, Councilmen and City Manager. He recounted the investigation of the incident and the action he had taken as a result of it. He reported that, after completing the investigation, he consulted the City's auditor. After going over an analysis of the event, the accountant said that the City "had the proper controls in place and if these controls had been followed, the safe would not have been left open. He felt, as we do, that the problem was not the controls but the people following these controls." The accountant concluded that "considering the circumstances the only thing that [the City] could do would be to terminate the employees." Mr. Philyaw then interviewed the City's attorney, who, after a review of the incident also said, "that because of the circumstances involved in this incident and, also, in the most recent incident of the same magnitude on April 19, 1983, and the lingering accounts of the incident of February 1981, we had no choice but to terminate these employees." Philyaw proceeded to ask Wilson and Mason to resign, telling them that the investigation of the September incident was caused by carelessness. Wilson, the first to be interviewed, said he would not resign, that Philyaw would have to "fire" him. Mason took the same view. Philyaw gave both of them a letter terminating their employment. All of this Philyaw included in his report.
 
 
 14
 Ms. Mason understood that she had a right under the applicable City procedures to appeal her dismissal to the City Manager. She, as well as Wilson, did appeal. They were given a hearing before the City Manager in October 1983. At this hearing "the plaintiff [Mason] was informed that this procedure was a preliminary hearing and that she would receive her 'due process' hearing before the City Council."[2] Evidence was taken from a number of witnesses. At the end of the hearing, Ms. Mason said that she had conducted an experiment and that she had found that when the envelope in which the safe combination had been placed was held to the light the safe combination could be discerned. This evidence was presented to the City Manager. He, however, sustained the recommendation of Philyaw, declaring in his decision of October 26, 1983 that it was the duty of Ms. Mason to see to "the security of the safe" and that "by virtue of [her] position [she was] accountable for incidents that occur within [her] purview."
 
 
 15
 Ms. Mason, as well as Wilson, appealed to the City Council. At the hearing on this appeal on November 15, 1983, all the evidence which was presented to the City Manager, including the additional statement of Ms. Mason that she could see the safe combination on the slip in the envelope when the envelope was held to the light, was before the City Council. There is no contention that Ms. Mason requested the right to offer any evidence other than that reported in the transcript of the hearing before the City Manager, which transcript was before the Council. In addition, counsel for Ms. Mason was permitted to present his argument on behalf of Ms. Mason. The Council asked both Philyaw and Ms. Mason to take an audio stress test. Both agreed and both successfully passed the test. The Council thereafter offered to reinstate Ms. Mason and Wilson without back pay for the time they were out of work during the investigation of the open safe incident and the execution of a release of liability. Wilson accepted the offer but Ms. Mason refused. Under those circumstances, Ms. Mason's termination was sustained by the Council.
 
 
 16
 Approximately two years later, on August 2, 1985, Ms. Mason filed this action claiming (1) that she was a permanent employee entitled to a due process hearing before termination under the applicable City ordinances; (2) that she had not been granted a procedural due process hearing before an impartial decision-maker; and (3) that she had been denied substantive due process by her arbitrary and capricious discharge. At trial, the City's motion for a directed verdict was denied. The cause was submitted to the jury which found in favor of Ms. Mason. That decision was appealed by the City.
 
 
 17
 On appeal, the initial issue was whether Ms. Mason had a right to procedural due process as a condition to severe discipline or discharge. Initially, the parties seem to have assumed that the City Ordinance on personnel adopted in 1980 was controlling on this issue. It later developed that in 1983, the City Council had adopted another ordinance governing personnel rights and in many respects repealing the provisions of the 1980 ordinance. Since Ms. Mason's termination occurred in 1983, it became important to ascertain which ordinance was dispositive of Ms. Mason's right to a due process hearing. This issue had not been resolved by the district court. It was necessary, therefore, to remand the cause to the district court to determine this point. Thus, in an unpublished opinion, we remanded the case for that purpose and did not consider the question whether the applicable ordinance granted Ms. Mason procedural due process in a suspension or termination of employment.
 
 
 18
 The district court, on remand, reviewed the two ordinances and found the Ordinance ratified on November 16, 1982, "to be effective January 1, 1983," applied to Ms. Mason's suspension or termination. But, it found that such Ordinance provided that the repeal of the right to procedural due process given Ms. Mason under the 1980 ordinance had not been affected by the repeal provision of this Ordinance, since the later Ordinance in Section 3 thereof declared
 
 
 19
 the repeal provided for in Section 2 hereof [of the 1980 Ordinance] shall not affect: (a) ... any contract or right established or accruing before the effective date of [such] Code.
 
 
 20
 Having found thus, the Court ordered judgment in favor of the plaintiff in accordance with the jury verdict. From that judgment the City has appealed.
 
 II.
 
 21
 The question whether the 1983 ordinance preserved the procedural due process rights of Ms. Mason under the 1980 ordinance has been extensively argued by the parties. Accepting, for the purpose of this case, the district court's conclusion that Ms. Mason's due process rights were preserved, we hold that Ms. Mason clearly received her procedural due process rights, as those rights are prescribed in Cleveland Board of Education v. Loudermill, 470 U.S. 532, 541-46 (1985). The Supreme Court there identified the "due process" required in the discharge or disciplining of a public employee to be not an "elaborate hearing" but simply one which must be "preceded by notice and opportunity for hearing appropriate to the nature of the case." It later spelled out more specifically these requirements in a case such as this. It said:
 
 
 22
 The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See Arnett v. Kennedy, 416 U.S., at 170-171 (opinion of Powell, J.); id., at 195-196 (opinion of White, J.); see also Goss v. Lopez, 419 U.S., at 581. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.
 
 
 23
 470 U.S. at 546.
 
 
 24
 "Due process" in a permanent employee discharge case is thus satisfied when, after notice of the charges and an explanation of the employee's evidence, the employee is provided an opportunity "to present reasons, either in person or in writing" and "an opportunity to present his side of the story." Ms. Mason was unquestionably granted such a hearing. She had a hearing before the City Manager and finally before the City Council. She was represented in both instances by counsel of her choice. There was a record made at the hearing before the City Manager; witnesses were heard; and Ms. Mason's counsel was accorded a full opportunity to "present [her] side of the story" on the record. That record was offered at the hearing before the City Council. Counsel, by his own admission, was given an opportunity to set forth fully Ms. Mason's side of the case at that time. Ms. Mason has identified no facts or arguments she wished considered which either the City Manager or the City Council denied her a right to adduce at such hearings. There was actually no dispute on the facts relating to Ms. Mason's initial supervision and later termination. Nor could there have been much dispute about the action taken. The safe was found open within 15 minutes after closing on September 14. There was no indication of forcible entry. Only three people had access to the safe through their possible access to the combination. Two of these could only obtain the combination by breaking the seal and reading the enclosure in the envelope they had. The envelope in the possession of both were examined and the seal was unbroken. Ms. Mason knew the combination, since she had set the combination and she had the combination in her billfold in her envelope. It seems fair to assume that no one of the three had opened the safe after it had been bolted. The contents of the safe were not disturbed. It was clearly a case, in any event, of carelessness. Such carelessness was, however, the very thing the City was seeking to prevent. Ms. York had been suspended without pay and transferred to another division, exactly what was offered Mason and Wilson and which Wilson accepted and Mason declined. Ms. Mason knew this. She had been warned that the City was not going to tolerate another act of the safe being found open. There was a reasonable basis for the decision of the City Council, though it would seem no such decision is required under the test of procedural due process in this context, a point we later address.
 
 
 25
 Ms. Mason suggests first that the procedure followed in her hearing was defective, in that she should have been given a full-blown trial-like hearing before the Council. Loudermill makes plain that such is not required, and this is especially so since there was no dispute over the known facts in this case.[3] Neither are we required in a Section 1983 action by a discharged public employee to pass on the propriety of a disciplinary discharge or disciplinary suspension to determine whether it was rationally warranted. As the Supreme Court in Bishop v. Wood, 426 U.S. 341, 349-50 (1976) put it:
 
 
 26
 The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.
 
 
 27
 We have consistently followed this ruling in Bishop. Thus, in Clark v. Whiting, 607 F.2d 634, 638-39 (4th Cir.1979), we said:
 
 
 28
 Federal courts thus have never been hesitant to intervene on constitutional grounds in the hiring, discharge or promotion of public employees, including academic personnel, where the asserted claim is that the action taken was tainted by racial or sex discrimination or was intended to penalize for the exercise of First Amendment rights. But, absent such impermissible sex or racial discriminations or First Amendment restraints--clear violations of positive express constitutional or statutory mandate--"[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies..."
 
 
 29
 See also Garraghty v. Jordan, 830 F.2d 1295, 1302 (4th Cir.1987); Daniels v. Quinn, 801 F.2d 687, 691 (4th Cir.1986) ("Due process principles did not require a neutral decision-maker, rather than Jordan, make the decision to suspend Garraghty. A deprivation proceeding need not be a full evidentiary hearing with witnesses and a neutral decision maker so long as the employee is given an opportunity to answer the charges." 830 F.2d at 1302).
 
 
 30
 The appellee contends, however, that the City Manager, Hicks, who had held the "preliminary hearing," did not qualify as a neutral and impartial decision maker and, in that circumstance, there was a violation of due process. She bases this position on the fact that Philyaw said at one time in his presentation that he had conferred during the investigation of the open safe on September 14 with Hicks. This fact, disputed by Hicks and supported only by Philyaw's oblique statement, did not disqualify Hicks or render his decision (assuming it was the final decision which it was not) from hearing Ms. Mason's appeal. See Garraghty v. Jordan, supra, and DeSarno v. Department of Commerce, 761 F.2d 657, 660 (D.C.Cir.1985). In the latter case, the Court said:
 
 
 31
 At the pre-termination stage, it is not a violation of due process when the proposing and deciding roles are performed by the same person. The law does not presume that a supervisor who proposes to remove an employee is incapable of changing his or her mind upon hearing the employee's side of the case.
 
 
 32
 It is not, however, necessary to consider whether Hicks, the City Manager, was neutral and impartial. His was not the final decision. This was made clear at the beginning of the hearing before him. Hicks emphasized at the hearing before him that the "final due process" hearing would be before the City Council. App. at 74. There is no real charge of partiality by Ms. Mason against any member of the City Council, and it was the Council which made the final decision. Further, their decision demonstrated the Council's impartiality. Their disposition of the appeal was similar to that earlier made in the similar case of Ms. York.
 
 
 33
 The appellee, whether because she recognized the weakness of her position on an alleged due process claim or not, asserts that the decision of the City Council violated her substantive due process rights because it was arbitrary and capricious. In essence, what Ms. Mason seeks by this claim of alleged violation of her substantive due process is to secure a trial of the reasons for her suspension which, by her refusal to accept such suspension, had been converted into a termination of employment. That is precisely what the Court declared in its language quoted supra:
 
 
 34
 In the absence of any claim that the public employee was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.
 
 
 35
 426 U.S. at 350.
 
 
 36
 Of course, had Ms. Mason's suspension and later discharge been motivated by racial or sex considerations or by a First Amendment violation, she might have some right of action. Bishop v. Wood, supra. But there is no such claim asserted by Ms. Mason in this case. We might add, also, that if the plaintiff in this case had a right to contest in this 1983 action the merits of the discharge--whether arbitrary or capricious--the record shows a clear rational basis for the Council's decision, a fact we have already noted.
 
 
 37
 To conclude: We find in this record no evidence of a violation of the due process rights of the plaintiff (Mason) and, therefore, we vacate the judgment below in favor of the plaintiff and remand the cause to the District Court with instructions to dismiss the action.
 
 
 38
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 42 U.S.C. Sec. 1983
 
 
 [2]
 This statement is quoted from a brief submitted in this case by counsel for Ms. Mason, Appendix p. 74
 
 
 [3]
 Justice Brennan, in his concurring and dissenting opinion in Loudermill dealt conclusively with this point. He wrote
 First, the Court today does not prescribe the precise form of required pretermination procedures in cases where an employee disputes the facts proffered to support his discharge. The cases at hand involve, as the Court recognizes, employees who did not dispute the facts but had "plausible arguments to make that might have prevented their discharge." Ante, at 544. In such cases, notice and an "opportunity to present reasons," ante, at 546, are sufficient to protect the important interests at stake.
 470 U.S. at 552.